*APPROVED FOR PUBLIC FILING BY CSO*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MOHAMMED ABDUL RAHMAN AL-SHIMRANI, *et al.*, <br> *Petitioners*, <br><br> v. <br><br> GEORGE W. BUSH, *et al.*, <br> *Respondents*. | ) ) ) ) ) ) ) Civil Action No. 05-2249 (RMC) ) ) ) ) ) ) |

**PETITIONER'S RESPONSE IN OPPOSITION TO RESPONDENTS' MOTION FOR PROCEDURES RELATED TO REVIEW OF CERTAIN DETAINEE MATERIAL**

Respectfully submitted by,

Martha Rayner, Esq.
Counsel to Petitioner,
Mr. Mohammed Al-Shimrani

1

TABLE OF CONTENTS

INTRODUCTION………………………………………………….................……..…3

I.  RESPONDENTS' FACTUAL ALLEGATIONS DO NOT ESTABLISH ANY LEVEL
   OF SUSPICION THAT WOULD SUPPORT THE SWEEPING AND EXTRAORDINARILY
   INTRUSIVE ACTION THEY HAVE TAKEN AND SEEK TO EXTEND............................3

    A. EVIDENCE DISCOVERED ON THE DECEDENTS' PERSONS
   AND IN THEIR CELLS DID NOT REVEAL ANY ABUSE OF
   ATTORNEY-CLIENT PRIVILEGED MATERIALS……………………………….4

    B. EVIDENCE DISCOVERED IN THE CELLS OF DETAINEES
   IMPRISONED ON THE SAME CELL BLOCK AS THE DECEASED DID NOT
   SURFACE ANY ABUSE OF ATTORNEY-CLIENT PRIVILEGED MATERIAL….6

    C. WITHOUT JUSTIFICATION, RESPONDENTS SEIZE ALL
   ATTORNEY-CLIENT PRIVILEGED MATERIALS FROM
   ALL THE MEN IMPRISONED AT GUANTANAMO ……..……..…..……….…7

    D. RESPONDENTS SORTING AND SCANNING OF DOCUMENTS
   MAINTAINED BY ELEVEN DETAINEES DOES NOT REVEAL
   ANY IMPROPER USE OF ATTORNEY-CLEINT PRIVILEGED MATERIALS...8

    E. RESPONDENTS' FEEBLE FACTUAL SHOWING DOES NOT IMPLICATE
   ATTORNEY-CLIENT PRIVILEGED MATERIAL IN THE INVESTIGATION….11

II. PETITIONER'S PRIVILEGED MATERIALS MAY NOT BE SEIZED AND
   REVIEWED WITHOUT AN INDIVIDUALIZED SHOWING OF PROBABLE
   CAUSE…………………………………………………………………………………..…11

III. A NEUTRAL SPECIAL MASTER MUST BE APPOINTED TO EXPEDITE A RAPID
   RETURN OF PRIVILEGED MATERIAL TO PETITIONER………..…..……………..16

CONCLUSION…………………………………………………………….……………17

**INTRODUCTION**

Respondents have seized and "scanned" highly privileged attorney-client material without advance judicial approval, without any notice to counsel or opportunity to be heard and did not disclose this conduct to this court and counsel until almost a month after the fact.  Now, Respondents seek to capitalize on their misconduct on the murkiest of a factual record and without legal authority and further invade the venerable and core principle of our profession, the attorney-client privilege, by requesting this Court's permission to review *all* privileged material maintained by *all* detainees.  Respondents have presented no cause, never mind sufficient cause, to believe that privileged material is in any way relevant to the investigation at issue.   Petitioner requests that this court order Respondents to immediately turn over all documents confiscated from Mr. Al-Shimrani to a Special Master and that the Special Master be charged with extricating all privileged materials for immediate return to Petitioner.   This Court should not allow Respondents to further assault the attorney-client privilege that is already so burdened and fragile in the context of these *habeas* cases.

### I. RESPONDENTS' FACTUAL ALLEGATIONS DO NOT ESTABLISH ANY LEVEL OF SUSPICION THAT WOULD SUPPORT THE SWEEPING AND EXTRAORDINARILY INTRUSIVE ACTION THEY HAVE TAKEN AND SEEK TO EXTEND

On June 10, 2006, Ali Abdullah Ahmed, Mani Shaman Turki al-Habardi al-Utaybi, and Yassar Talal al-Zahrani, were found dead in their respective cells in Camp 1 of Guantánamo

Bay, Cuba.[1]  Respondents assert that the three men took their own lives by hanging themselves. See Respondents' Motion for Procedures Related to Review of Certain Detainee Materials and Request for Expedited Briefing, at 3 [hereinafter "Respondents' Motion"] (July 7, 2006).  As was appropriate, Respondents began an investigation into "the circumstances of the suicides. . . as well as any broader plot or planning for other such attempts in the past or future."[2] Id. at 1.

### A. EVIDENCE DISCOVERED ON THE DECEDENTS' PERSONS AND IN THEIR CELLS DID NOT REVEAL ANY ABUSE OF ATTORNEY-CLIENT PRIVILEGED MATERIALS

As part of the investigation, Respondents searched the decedents' bodies, which revealed each had left a note on their persons.  Respondents refer to these communications as "suicide notes," implying that each was written by one of the deceased and that the contents included an explanation of why each decedent took his own life, but Respondents have chosen not to reveal this information.[3]  See Respondents' Motion at 5.  Respondents do not allege that the contents of the notes indicate any plot, plan or coordination among the three men who died nor among the other men imprisoned at Guantánamo.  In addition, Respondents do not allege that these notes were written on notepaper indicating attorney-client privileged material.

---

[1] See U.S. Department of Defense, American Forces Information Service (June 12, 2006), http://www.defenselink.mil/news/Jun2006/20060612_5387.html.

[2] By referring to a "broader plot or planning," I take it that Respondents mean a plan or plot involving persons beyond the three men who died.  In addition, though Respondents do not mention such, hopefully Respondents' investigation includes inquiry into how the deceased were left unmonitored for the period of time it would have taken for them to have died.

[3] The Court should draw a negative inference against Respondents for failing to bring this information before the court, namely that the notes do not indicate a wider plot.  Any argument by Respondents that release of the contents of the notes would compromise the investigation is easily resolved by designating it as protected information or classified to prevent disclosure to the men imprisoned at Guantánamo and the public.

Respondents also searched the cells of the deceased and found one note in the cell of one of the deceased that "appeared" to have been written by someone else. See Respondents' Motion at 5. Again, Respondents do not inform this Court of the contents of this note nor allege that the content provides any support that the June 10, 2006 deaths were plotted, planned or coordinated beyond the three men who died. In addition, Respondents do not allege that the content of this note indicates any future plots or plans. Respondents do not supply this Court with the identity of the person who allegedly wrote the note, whether the author was one of the other men who died on June 10, 2006, was another detainee or, if another detainee, whether he was imprisoned within or without the decedents' cell block. Id. at 5. Rather, Respondents simply allege that the contents of the note are related to the suicides, that the note was stamped on the back as privileged attorney-client material, and that none of the deceased detainees had been "visited" by an attorney, leading Respondents to conclude that the notepaper must have been supplied by another detainee. Id. Though the notepaper may have been supplied by another detainee, the deceased detainee in whose cell the note was found did not use the privilege stamp to shield the note from review by military guards. In fact, Respondents claim the note was hidden in a mesh wall, which by definition would expose it to plain view; but in any case, the deceased did not attempt to hide the note through any abuse of privileged materials. Id.

Respondents disclose only superficial facts and withhold critical information about the notes, yet argue that the notes "indicate the passing of materials and messages between detainees and that some level of planning or coordination of the suicides had taken place." Id. Indeed, it does appear from these facts that *someone* wrote *something* on a piece of pre-stamped notepaper that was *somehow* given to one of the men who died on June 10, 2006. Without knowing the content of the note, however, this fact does not establish Respondents' sweeping conclusion that

5

some level of planning and coordination had taken place.

### B. EVIDENCE DISCOVERED IN THE CELLS OF DETAINEES IMPRISONED ON THE SAME CELL BLOCK AS THE DECEASED DID NOT SURFACE ANY ABUSE OF ATTORNEY-CLIENT PRIVILEGED MATERIAL

Yet, Respondents extended their investigation to the cells and detainees housed on the same cell block as the decedents. The search turned up two notes in one detainee's cell that are alleged to have been written by two of the deceased men and are on notepaper stamped as confidential attorney-client material. See Respondents' Motion at 6. Respondents do not identify this detainee nor inform the court whether he is the same person who wrote the note found in the cell of one of the deceased. In addition, Respondents do not inform the court whether the pre-stamped notepaper found in the living detainee's cell matches the pre-stamped notepaper found in the deceased detainee's cell. Moreover, Respondents fail to inform the court as to whether this living detainee has a lawyer and thus had access to his own pre-stamped notepaper. Finally, and again, strikingly, Respondents fail to reveal the contents of both notes. Id.

Though Respondents infer impropriety in the passing of notes between detainees, they do not cite to prison rules that prohibit this conduct. Nor do they cite to prison rules that prohibit the use of pre-stamped notepaper for note writing between detainees. Respondents, again, infer that the living detainee used the pre-stamped notepaper to shield the contents from military guards, but Respondents do not allege that the notes were hidden among privileged documents that the living detainee might have maintained. Respondents do not allege that the notes were hidden at all.

Thus, though the notes written by two of the deceased were written on pre-stamped notepaper,[4] there is no indication that the deceased or the living recipient abused the privileged system in sending or maintaining the notes. Respondents have not established any improper use of the pre-stamped notepaper, nor alleged facts that established a plan or coordination, beyond the three men who died, within the cell block.

### C. WITHOUT JUSTIFICATION, RESPONDENTS SEIZE ALL ATTORNEY-CLIENT PRIVILEGED MATERIALS FROM ALL THE MEN IMPRISONED AT GUANTANAMO

Respondents, however, assert that the discovery of the two notes in the cell of a detainee on the same cell block "led" NCIS to expand its investigatory efforts to include *all* materials in *all* detainee cells. See Respondents' Motion at 6.[5] Respondents surely knew that this vast expansion of the investigation would result in the confiscation and review of privileged material. Respondents simply do not provide any facts that indicate communication with the three deceased men went beyond the one detainee in the same cell block or that there was communication with the living detainee in the same cell block and other men imprisoned in other camps. Yet Respondents take the extreme step of confiscating the written materials of all detainees, knowing at the time of confiscation that the materials would include privileged material. Then, Respondents compound the problem by continuing their investigation by sorting

---

[4] If the use of pre-stamped notepaper poses security risks for Respondents then this problem is easily remedied by prohibiting detainees from maintaining this sort of notepaper. The use of the notepaper as alleged by Respondents simply does not establish any detainee abuse, attorney impropriety or provide a basis for a wholesale search and review of all privileged material.

[5] This vast expansion of the investigation was initially to "include *handwritten* materials in all enemy combatant detainees' cells," Respondents' Motion, Exh. B. Kisthardt Decl., ¶ 4 (emphasis added), but inexplicably led to NCIS seizing "personal items and papers, including legal material and other correspondence," id., that went way beyond handwritten materials. When NCIS personnel began sorting and conducting a preliminary scan of the materials on June 18, 2006

and reviewing the written materials of eleven detainees,[6] again knowing that at least some of these eleven would have counsel and thus would maintain some privileged materials.

### D. RESPONDENTS SORTING AND SCANNING OF DOCUMENTS MAINTAINED BY ELEVEN DETAINEES DOES NOT REVEAL ANY IMPROPER USE OF ATTORNEY-CLEINT PRIVILEGED MATERIALS

Unsurprisingly, investigators came upon privileged material, but most importantly, investigators found nothing implicating abuse by detainees or *habeas* counsel of the attorney-client privilege system. Investigators found five documents from one detainee that Respondents call to this Court's attention. The first two documents, and the only ones that are relevant to the investigation, were not marked or stamped as attorney-client privileged material nor found within any folders or files marked as privileged attorney-client material. See Respondents' Motion at 7.

The other three documents noted by Respondents were properly contained in envelopes marked as attorney-client privileged information. They are documents that *habeas* lawyers handle and provide to clients on a regular basis, yet Respondents imply, not so subtly, that the discovery of these documents are somehow suspicious. Id. The first document, marked with a "Secret" classification marking that was lined out and marked "Unclassified," is a declassified document that is routinely provided by Respondents in public filings and would be routinely

---

they did not limit their review to handwritten items. See Id. ¶ 5.

[6] Though Respondents do not explain why the materials of these eleven detainees were scanned first, it seems unlikely this was a random decision.

provided to a client. Id. See e.g. Exhibit A (Respondents' Response to Order to Show Cause, Al-Shimrani v. Bush, Civil Action No. 05-CV-2249 (RMC) (Jan. 27, 2006), ECF Doc.18, Exhibit A, p. 6. Again, Respondents imply impropriety by noting that the second document found in an envelope marked attorney-client privileged material was stamped "FOUO," or "For Official Use Only," and would "typically be subject to special handling." See Respondents' Motion at 7. This is absolutely inaccurate. Documents marked FOUO abound in the Guantánamo *habeas* cases and have been publicly filed by the Department of Defense. See e.g. Exhibit B, (Unclassifed/FOUO Document Regarding Petitioner Al-Shimrani Obtained from Department of Defense Disclosure Pursuant to the Associated Press' Freedom of Information Act Litigation). The material in the third marked envelope did not bear any classification or special handling markings and Respondents make no allegation that the "scan" indicated that the documents were anything but proper privileged material. Id.

Thus the two documents that raise questions are found in the materials of one detainee, who apparently was targeted based on other information that Respondents choose not to share with this Court and were not stamped privileged nor found hidden in envelopes marked attorney-client privileged material. Most importantly, the material in the three envelopes marked attorney-client privileged information are not related to the investigation, do not violate the Protective Order[7] and are properly contained in a marked envelope. Yet, Respondents use these facts to justify a massive intrusion into all privileged material.

Respondents' extraordinary request for relief based on facts that do not relate to that relief surfaces Respondents' thinly veiled accusation that *habeas* lawyers supplied the two documents that raise concern. This is deeply troubling, because Respondents' motion, which on

---

[7] See In re Guantánamo Detainee Cases, 344 F. Supp. 2d 174 (D.D.C. Nov. 8, 2004).

9

its face seeks a court order to advance an investigation into the death of three men, actually seeks to investigate *habeas* attorneys and determine whether documents have been supplied in violation of the Protective Order. In addition, this is deeply troubling because Respondents do not establish any facts that implicate *habeas* attorneys in the deaths of these three men nor do they establish any facts that indicate any violations of the Protective Order.

      First, The JTF email discovered in one detainee's cell could not have been provided by a *habeas* lawyer, since counsel would not have access to such a document. And, it is important to note, Respondents do not allege that any *habeas* counsel had any access to this email. See Respondents' Motion at 7. The discovery of this document in the possession of a detainee (notably not secreted among privileged materials) indicates a breakdown in security among JTF-Guantánamo staff and simply has no relevancy to privileged materials and *habeas* counsel. As to the second document found in the same detainee's cell, without knowing the contents of the document, the author, the language and whether it is typed or handwritten, it is impossible to ascertain what relevancy it has to Respondents' motion. A hand-written, internally produced document that is not hidden among privileged material does not implicate privileged materials nor *habeas* counsel and would provide no support for the radical relief sought by Respondents. Respondents' careful avoidance of disclosing these details suggests that disclosure would not support their motion. This Court should not authorize a wholesale investigation that seeks to target *habeas* counsel by reviewing attorney-client privileged material that is based on pure conjecture of the most harmful kind and does not establish any individualized suspicion against Mr. Al-Shimrani, his counsel, nor any other petitioner or *habeas* counsel.[8]

---

[8] The source of the knot-tying document appears to have relevancy to the investigation, but in no way supports a wholesale search of all privileged materials. If Respondents have reason to

### E. RESPONDENTS' FEEBLE FACTUAL SHOWING DOES NOT IMPLICATE ATTORNEY-CLIENT PRIVILEGED MATERIAL IN THE INVESTIGATION

Respondents' feeble factual showing does not justify the extraordinary order they seek: a full review of the content of all privileged material. They have made no showing that any detainee outside the cell block in which the deceased were imprisoned communicated in any way with the deceased. They have made no showing that any detainee in or outside the cell block in which the deceased were housed misused the privilege system by shielding documents or communication by hiding it in or among privileged materials. They have made no showing that the documents found in one detainees cell enclosed in envelopes marked attorney-client privileged materials are anything other than privileged materials. Finally, Respondents have made no showing that the two documents discovered in one detainee's cell that are of "interest" to Respondents, were marked attorney-client privileged materials, hidden in an envelope marked as such, nor that any *habeas* counsel supplied the documents. Respondents have presented no cause, never mind sufficient cause, to believe that privileged material is relevant to the investigation.

### II. PETITIONER'S PRIVILEGED MATERIALS MAY NOT BE SEIZED AND REVIEWED WITHOUT AN INDIVIDUALIZED SHOWING OF PROBABLE CAUSE

The attorney-client privilege is "the oldest of the privileges for confidential

---

believe that the knot-tying document was supplied by an external source, then Respondents should conduct an investigation that is reasonably related to their investigative and security needs and that seeks a court order allowing review of the privileged materials maintained by the one detainee who possessed it should there be a sufficient factual showing.

11

communications known to the common law."[9] Its purpose is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."[10] As another District Court Judge has recognized in the context of the Guantánamo litigation, "[t]he privilege that attaches to communications between counsel and client has long held an exceptional place in the legal system of the United States."[11]

Nowhere is the effectuation of the privilege more important than in the context of pre-trial detention. "An inmate's need for confidentiality in his communications with attorneys through whom he is attempting to redress his grievances is particularly important."[12] For such prisoners, "contact with an attorney and the opportunity to communicate privately is a vital ingredient to the effective assistance of counsel and access to the courts."[13] Even for prisoners convicted of crimes, the Supreme Court has held, "[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right to access to the courts are invalid."[14]

Seizure of legal papers is particularly egregious because it strikes at the heart of the attorney-

---

[9] Upjohn Co. v. United States, 449 U.S. 383, 389 (1981).

[10] Swidler & Berlin v. United States, 524 U.S. 399, 403 (1998); see also Lanza v. State of New York, 370 U.S. 139, 143-44 (1962) ("[I]t may be assumed that even in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection.").

[11] Al Odah v. United States, 346 F. Supp. 2d 1, 10 (D.D.C. Oct. 20, 2004).

[12] Bach v. Illinois, 504 F.2d 1100, 1102 (7th Cir. 1974); see also Johnson-El v. Schoemehl, 878 F.2d 1043, 1051 (8th Cir. 1989) ("Pretrial detainees have a substantial due process interest in effective communication with their counsel and in access to legal materials.  When this interest is inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised.").

[13] Bach, 504 F.2d at 1102.

[14] Procunier v. Martinez, 416 U.S. 396, 419 (1974).

client relationship and interferes with the inmate's access to the courts. "The taking of legal papers will often (though perhaps not always) interfere with an inmate's right of access to the courts. . . . [T]he destruction or withholding of inmates' legal papers burdens a constitutional right, and can only be justified if it is reasonably related to a legitimate penological interest."[15]

Respondents' vague allegations of notes found in one of the decedent's cell appearing to have been written by someone else cannot qualify as a "legitimate penological interest" in seizing *all* legal documents from *all* the men imprisoned at Guantanamo. Seizing legal papers interferes with a prisoner's access to courts and chills the giving, receiving, and continued possession of communications from attorney to client, particularly when seized without notice to the prisoners' attorneys or the court.

This Court has recognized that the men imprisoned at Guantanamo, who have not been tried and who seek the opportunity through their counsel to challenge the basis of their detention, have a right to counsel and are entitled to a confidential relationship with their counsel. Over Respondents' objections, "[t]he Court [found] that Petitioners are entitled to be represented by counsel."[16] Thus, "the Court determine[d] that the government is not entitled to unilaterally impose procedures that abrogate the attorney-client relationship and its concomitant attorney-client privilege covering communications between them."[17] Yet Respondents have decided, in the teeth of this decision, "to unilaterally impose procedures that abrogate the attorney-client relationship and its concomitant attorney-client privilege covering communication between

---

[15] Goff v. Nix, 113 F.3d 887, 892 (8th Cir. 1997) (internal citations omitted); see also Simmons v. Dickhaut, 804 F.2d 182, 183-84 (1st Cir. 1986); Ruiz v. Fisher, 165 F.3d 28, No. 96-4212, 1998 WL 661139, at *2 (6th Cir. 1998); Wright v. Newsome, 795 F.2d 964, 968; Carter v. Hutto, 781 F.2d 1028, 1031–32 (4th Cir. 1986); Hiney v. Wilson, 520 F.2d 589, 591 (2d Cir. 1975).

[16] Al Odah, 346 F. Supp. 2d at 5.

[17] Id.

them."[18]

To give meaning to the attorney-client privilege in this context, the Court implemented Access Procedures which created avenues of confidential communication between prisoners and their attorneys by laying the ground rules for in-person meetings and for written communication between these parties. Respondents sought the ability to monitor these communications, but that request was squarely rejected by the Court.

Respondents' seizure, sorting and scanning of Petitioner's documents violated the Protective Order and accompanying Access Procedures. Respondents do not attempt to justify its actions under the Protective Order, but rather admit that the seized materials "will likely include some number of attorney-client communications potentially subject to attorney-client privilege."[19] But Respondents' unilateral abrogation of the privilege would have been unlawful even if it had not directly violated a Court order.

Respondents attempt to justify their search and seizure of legal materials by analogy to prison searches for contraband and dangerous items, stating that prison officials "must be permitted to take all reasonable steps to mitigate and address potential threats." See Respondent's Motion, 13-14. However, Respondents do not rely on any authority indicating that legal mail could be seized and reviewed by prison guards or any other government actors, and offer no additional support for such a claim. See Respondents' Motion page 13-14 (citing to Bell v. Wolfish, 441 U.S. 520, 555-557 (1979) (supporting a rule allowing searches of inmates' cells to proceed without the inmate being present. This case did not address the issue of legal mail or privileged attorney-client communications); Hudson v. Reno, 468 U.S. 517 (1984) (upholding

---

[18] Id.

[19] See Respondents' Motion at 9.

random prison cell searches, with no mention of legal mail or privileged attorney-client communications); Block v. Rutherford, 468 U.S. 576 (1984) (finding similarly regarding prison searches, yet also not addressing the question of privileged information)).

Abrogation of the attorney-client privilege in any context requires Respondents to make a specific, *individualized* showing that there is sufficiently compelling justification for invading the privilege.  For example, where the government invokes the crime-fraud exception to the attorney-client privilege, it bears the burden of making an adequate showing that the exception applies – i.e., that *that* client "made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act," and actually carried out that act.[20]  Similarly, when the government seizes materials from a location that likely contains privileged papers, that seizure must be supported by probable cause and a warrant, and it still must employ appropriate means of screening out privileged materials.[21]

Respondents have not provided authority that even suggests the privilege may be invaded without an *individualized*, sufficiently rigorous showing that materials of a particular client or particular attorney are likely to have been abused in furtherance of a crime.[22]  Even when such

---

[20] In re Sealed Case, 107 F.3d 46, 49 (D.C. Cir. 1997); see also Doe v. United States, No. 03-6145, 2003 WL 22879314 (2d Cir. Dec. 4, 2003) (reversing contempt order where government failed to meet burden of showing that crime-fraud exception applied); In re Richard Roe, Inc., 68 F.3d 38, 40 (2d Cir. 1995) (requiring a showing of probable cause to believe that a crime or fraud has been attempted or committed and that attorney-client communications were used to further that crime or fraud); In re Grand Jury Subpoenas Duces Tecum, 798 F.2d 32, 34 (2d Cir. 1986) (reversing civil contempt order because the government did not satisfy its burden of showing that the crime-fraud exception applied to the documents the corporation failed to produce).

[21] See, e.g., United States v. Stewart, No. 02 CR. 396(JGK), 2002 WL 1300059 (S.D.N.Y. June 11, 2002).

[22] See, e.g., United States v. Skeddle, 989 F. Supp. 890, 894 (N.D. Ohio 1997) (permitting review of attorney-client materials "[i]n light of the finding of probable cause that had preceded the issuance and execution of the warrant"); United States v. Grant, No. 04 CR 207(BSJ), 2004

documents will be reviewed *in camera* by the court, and not by the government, "the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."[23]

Respondents have made no such individualized showing here that materials of Mr. Al-Shimrani or his attorneys have been abused in furtherance of a crime.  Furthermore, Respondents have made no individualized showing regarding Mr. Al-Shimrani whatsoever.  Absent such a showing, there is nothing to suggest that the extraordinary relief requested by Respondents should be granted.

### III. A NEUTRAL SPECIAL MASTER MUST BE APPOINTED TO EXPEDITE A RAPID RETURN OF PRIVILEGED MATERIAL TO PETITIONER.

A Special Master should be appointed by the Court and charged with quickly identifying privileged material belonging to Petitioner for prompt return to Petitioner.  The Special Master should not inspect documents for content except to the extent necessary to determine whether the document is privileged material.  The Special Master should not inspect the contents of privileged materials for relevancy to the investigation or for adherence to the Protective Order.  Typed letters on law firm letterhead can be rapidly designated as privileged (no matter what language and without resort to translation) as can legal papers related to Petitioner's *habeas* matter, e.g. court filings, Administrative Review Board documents, Combat Status Review Tribunal related documents.  Documents not identified as privileged or attorney-work product by

---

WL 1171258, at *2 (S.D.N.Y. Dec. 14, 1982) (documents "seized pursuant to a valid warrant, which was based upon a [judicial] finding of probable cause").

the Special Master should be turned over to NCIS investigators for return to Petitioner promptly after making a determination on relevancy to the investigation. See Exhibit C, Proposed Order.

## CONCLUSION

The loss of three lives on June 10, 2006 should be investigated, but there is no reason to believe that attorney-client materials relate in any way to the investigation. The intrusive action Respondents request this Court to approve threatens the complete loss of the attorney-client privilege, which is already teetering on the verge of oblivion due to Respondents' unilateral decision to confiscate and review privileged materials.

Dated: New York, New York
      July 20, 2006.

                        Respectfully submitted,
                        Counsel for Petitioners
                        _____/s/_____
                        Martha Rayner (Pursuant to LCvR 83.20(g))
                        (NY-MR-1423)

                        Ramzi Kassem (NY-RK-3567)
                        James A. Cohen (NY-JC-3836)
                        Lincoln Square Legal Services

                        Fordham University School of Law
                        33 West 60th Street, 3d Floor
                        New York, New York 10023
                        Telephone: (212) 636-6934
                        Fax: (212) 636-6923

---

[23] United States v. Zolin, 491 U.S. 554, 572 (1989) (quotations and citations omitted).