# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MOHAMMED ABDUL RAHMAN AL SHIMRANI, *et al.,* | ) ) ) ) |
| Petitioner, | ) ) |
|  | ) Civil Action No: 05-2249 (RMC) |
| v. | ) ) ) |
| GEORGE WALKER BUSH, *et al.,* | ) ) ) |
| Respondents. | ) ) ) |

## MOTION FOR RECONSIDERATION OF ORDER DISMISSING PETITION FOR HABEAS CORPUS AND DENYING MOTION TO STAY PROCEEDINGS AND HOLD IN ABEYANCE

## PRELIMINARY STATEMENT

In light of the Supreme Court's recent, and incredibly rare, reversal of its previous denial of certiorari, Mr. Mohammed Abdul Rahman Al-Shimrani ("Mr. Al-Shimrani" or "Petitioner") requests that this Court reconsider its May 8, 2007 order dismissing Mr. Al-Shimrani's petition for habeas corpus and denying his motion to stay and hold the matter

in abeyance.[1]   On Friday June 29, 2007, the Supreme Court granted certiorari in *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007), using a procedural mechanism it has not exercised in decades.   The Court, pursuant to Supreme Court Rule 44.2 ("Sup. Ct. R."), granted the *Boumediene* petitioners' petition for rehearing, vacated its April 2, 2007 order denying certiorari and granted the writ of certiorari.   The Court's action indicates that there were "intervening circumstances of a substantial or controlling effect," or that evidence of "substantial grounds not previously presented" became available. Sup. Ct. R. 44.2.   Petitioner seeks reconsideration of this Court's decision in light of the Supreme Court's reconsideration of its previous decision.

## PROCEDURAL HISTORY

Petitioner filed a petition for writ of habeas corpus on November 17, 2005.   On April 19, 2007, after the Supreme Court's April 2, 2007 denial of certiorari in *Boumediene*, respondents filed a motion to dismiss the petition relying on the CADC's February 20, 2007 *Boumediene* decision and subsequent denial of certiorari.   This Court, on May 8, 2007, dismissed Mr. Al-Shimrani's petition for habeas corpus and denied his motion to stay and abey for lack of subject matter jurisdiction. *See* Exhibit A – ECF 48. On June 7, 2007, Petitioner filed a Notice of Appeal challenging the Order of May 9, 2007.[2]

---

[1] *See* Exhibit A (*Al-Shimrani v. Bush*, Civil Action No. 05-CV-2249 (RMC) (May 8, 2007), ECF Doc.48 ("Exhibit A – ECF 48").
[2] A Rule 60(b) motion for relief from judgment is not among the post-trial motions that operate to preclude appellate review during their pendency. *Hoai v. Vo*, 935 F.2d 308, 312 (D.C. Cir. June 1991). *See* Fed. R. App. P. 4(a)(4). When both a Rule 60(b) motion and an appeal are pending simultaneously, appellate review may continue uninterrupted. At the same time, the District Court may consider the 60(b) motion and, if the District Court indicates that it will grant relief, the appellant may move the appellate court for a remand in order that relief may be granted. *Hoai*, 935 F.2d at 312. *See also*, *Greater Boston Television Corp. v. FCC*, 463 F.2d 268, 280 (D.C. Cir. Dec. 29, 1971) (Stating that a Rule 60(b) motion to provide relief may be considered by the district court while an appeal is pending).

In compliance with Mr. Al-Shimrani's Notice of Intent to File a Petition Under the Detainee Treatment Act, *Al-Shimrani v. Bush*, 05-CV-2249 (RMC) (May 9, 2007), ECF Doc.47, Petition did file, on June 14, 2007, a petition for review of his Combatant Status Review Tribunal in the D.C. Circuit Court of Appeals pursuant to the Detainee Treatment Act of 2005, Pub. L. No. 109-148, §§ 1001-1006, 119 Stat. 2680, 2739-45 (Dec. 30, 2005) ("DTA").

## JURISDICTION

Petitioner now, pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. Proc.") 60(b), moves for Reconsideration of the Dismissal of his Petition for Habeas Corpus and his Motion to Stay and Abey. Fed. R. Civ. Proc. 60(b) grants this Court the power to relieve a party from a final judgment, order, or proceeding when the Court finds "reason[s] justifying relief from the operation of the judgment." Fed. R. Civ. Proc. 60(b)(6).

## *BOUMEDIENE* LEGAL BACKGROUND

On February 20, 2007, in *Boumediene,* the D.C. Circuit ruled that the Military Commissions Act of 2006 (MCA), Pub. L. No. 109-366, 120 Stat. 2600 (2006), eliminated the jurisdiction of the federal courts to consider habeas actions by Guantánamo detainees, and that the Guantánamo detainees, as aliens outside the sovereign territory of the United States, lack constitutional rights and therefore lack standing to challenge the elimination of jurisdiction under the Suspension Clause of the United States Constitution.[3] *See Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007).

On March 5, 2007, the *Boumediene* and *Al Odah* petitioners filed certiorari petitions in the Supreme Court seeking review of the D.C. Circuit's judgment. S. Ct. Nos.

---

[3] *Boumediene* is consolidated with *Al Odah v. United States, CADC docket No. 05-5064.*

06-1195 & 06-1196.  On April 2, 2007, the Supreme Court denied the petitions. 127 S.Ct. 1478 (2007).  On April 27, 2007, petitioners filed rehearing petitions and motions to defer consideration of those petitions pending the petitioners' exhaustion of their remedies under the DTA. In their June 22, 2007 reply to the government's opposition to a rehearing, the *Al Odah* petitioners annexed a declaration of Lieutenant Colonel Stephan Abraham, United States Army Reserve, a military intelligence officer who was involved in the Combatant Status Review Tribunal process, which called sharply into question the legitimacy and fairness of that regime. *See* Exhibit B, Reply to Opposition to Petition for Rehearing, *Al Odah v. United States*, 06-CV-1196 (June 22, 2007), Appendix 8-15.  A week later, on June 29, 2007, the Supreme Court granted the petition for rehearing, vacated its previous order of April 2, 2007 denying certiorari and granted a writ of certiorari in *Boumediene* and *Al-Odah*.    Exhibit C,    Order Granting Certiorari, *Boumediene v. Bush* (06-1195), *Al Odah v. United States* (06-1196), June 29, 2007.

## POINT I – THE DISTRICT COURT'S DISMISSAL OF MR. AL-SHIMRANI'S PETITION FOR HABEAS CORPUS SHOULD BE RECONSIDERED IN LIGHT OF THE SUPREME COURT'S EXTRAORDINARY RECONSIDERATION OF ITS PREVIOUS ORDER

In accordance with Fed. R. Civ. Proc. 60(b)(6), a court may consider "any other reason justifying relief from the operation of the judgment" when entertaining a motion for reconsideration.  While this remedy is only available in extraordinary circumstances, *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863-64, 100 L. Ed. 2d 855, 108 S. Ct. 2194 (1988), this Court's dismissal of Mr. Al-Shimrani's habeas petition meets that threshold, as "imprisonment" constitutes an "extraordinary" fact. *Ackermann v. United States*, 340 U.S. 193 (1950) (finding that *imprisonment, lack of counsel, or*

*deprivation of trial* were "extraordinary" facts) (emphasis added); *see also Klapprott* v. *United States*, 335 U.S. 601, 614-615, 93 L. Ed. 266, 69 S. Ct. 384 (1949). (holding that continued imprisonment without an opportunity to defend oneself, after a proceeding on inadequate facts must be reconsidered because "[f]air hearings are in accord with elemental concepts of justice, and the language of the 'other reason' clause of 60 (b) is broad enough to authorize the Court to set aside the default judgment") (internal citations omitted). Rule 60(b)(6) allows courts "to vacate judgments whenever such action is appropriate to accomplish justice," *Id.*

Respondents' imprisonment of Mr. Al-Shimrani, now deep into 6 years under the harsh conditions that exist at Guantanamo, without any independent judicial review of the legality of his detention nor the factual allegations that the government asserts justify indefinite imprisonment without trial, establishes an extraordinary circumstance. This extraordinary circumstance is compounded by the recent disclosure by Lieutenant Abraham which reveals the staggering inadequacies of the military's Combat Status Review Tribunal regime, which has been held up by Respondents as providing a legitimate review process justifying indefinite detention. These extraordinary circumstances coupled with the now certainty that the Supreme Court will decide this Court's jurisdiction should compel this Court to reinstate Mr. Al-Shimrani's habeas petition.


**POINT II – THIS COURT HAS THE AUTHORITY TO DENY RESPONDANTS' MOTION TO DISMISS AND GRANT MR. AL-SHIMRANI'S MOTION TO STAY AND HOLD PROCEEDINGS IN ABEYANCE**

In *Al Ginco v. Bush*, D.C. Cir. No. 06-5191 (June 7, 2007), the D.C. Circuit denied the Government's motion to dismiss habeas corpus petitions.  In doing so the *Al Ginco* court explained that

> [t]he district court may consider in the first instance respondents' motion to dismiss and petitioner's motion to stay and hold in abeyance, which are currently pending before the district court in the actions underlying these consolidated appeals.

The D.C. Circuit's order makes clear that this Court retains jurisdiction over this case and that this Court is not required to dismiss this case and may grant Petitioner's stay and abey motion.

In the vast majority of habeas petitions pending before in the D.C. district court, courts have chosen to deny the government's motion to dismiss and instead, held the cases in abeyance via administrative closure, *see e.g.*, *Zadran et al.* v. *Bush et al.*, 05-cv-2367 (June, 29 2007) (D.C.C. 2007) (J. Roberts), or held the government's motion in abeyance and thus maintain already existing stays or administrative closures. *See*, *e.g.*, *Mohammon, et al. v. Bush*, 04-cv-01164 (Jan. 31, 2007) (D.C.C. 2007) (J. Walton).  This Court has the authority to do likewise.

The pending *Boumediene* case is dispositive on the question of jurisdiction here. The Supreme Court's rare decision to reverse itself and grant cert is an extraordinary measure that indicates just how subject the current law is to change.  This Court is faced with novel and currently-undecided issues of law and Mr. Al Shimrani, therefore, requests that this Court reconsider its dismissal of his petition for habeas corpus and his motion to stay.

## CONCLUSION

Mr. Al-Shimrani respectfully requests that this Court reconsider its dismissal of his petition for habeas corpus and denial of his motion to stay and abbey in accordance with section 6 of Fed. R. Civ. Proc. 60(b).


Dated: New York, New York
       July 03, 2006.

                                        Respectfully submitted,
                                        Counsel for Petitioner

                                        _____
                                        Martha Rayner (NY-MR-1423)
                                        Ramzi Kassem (RK-NY-3567)

                                        LINCOLN SQUARE LEGAL SERVICES
                                        Fordham University School of Law
                                        33 W. 60th Street, 3rd Floor
                                        New York, NY 10023
                                        Telephone: (212) 636-6934
                                        Fax: (212) 636-6923

# Exhibit A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MOHAMMED ABDUL RAHMAN AL-SHIMRANI, ) ) ) ) | |
| Petitioner, ) ) | |
| v. ) | Civil Action No. 05-2249   (RMC) |
| GEORGE W. BUSH, *et al.*, ) ) | |
| Respondents. ) ) | |

### MEMORANDUM OPINION AND ORDER

Mohammed Abdul Rahman Al-Shimrani, a detainee at the United States Naval

Station in Guantanamo Bay, Cuba, filed a petition for a writ of habeas corpus on November 17,

2005. Now before the Court are (1) Respondents' Motion to Dismiss and (2) Petitioner's

Opposition, Motion to Stay and Hold Proceedings in Abeyance, and Notice of Intent to File a

Petition Under Detainee Treatment Act. Upon consideration of the pleadings and the case law,

*see Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007); *Kiyemba v. Bush*, No. 05-5487, 2007

WL 964612 (D.C. Cir. Mar. 22, 2007); *Zalita v. Bush*, No. 07-5129 (D.C. Cir. Apr. 25, 2007)

(*per curiam*), it is hereby

**ORDERED** that Respondents' Motion to Dismiss [Dkt. #42 ] is **GRANTED**; and

it is

**FURTHER ORDERED** that Petitioner's Motion to Stay and Hold Proceedings

in Abeyance [Dkt. # 46] is **DENIED**; and it is

**FURTHER ORDERED** that this case is **DISMISSED** for lack of subject matter jurisdiction, and all other pending motion are hereby **DENIED** as moot; accordingly, this case is closed.

      **SO ORDERED.**

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge

DATE: May 9, 2007

# Exhibit B

No. 06-1196

# In the Supreme Court of the United States

KHALED A. F. AL ODAH, ET AL., PETITIONERS,

v.

UNITED STATES OF AMERICA, ET AL., RESPONDENTS.

ON PETITION FOR WRIT OF CERTIORARI TO
THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

## REPLY TO OPPOSITION TO
## PETITION FOR REHEARING

DAVID J. CYNAMON
MATTHEW J. MACLEAN
OSMAN HANDOO
PILLSBURY WINTHROP
  SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, DC 20037
202-663-8000

GITANJALI GUTIERREZ
J. WELLS DIXON
SHAYANA KADIDAL
CENTER FOR
  CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
212-614-6438

THOMAS B. WILNER
  COUNSEL OF RECORD
NEIL H. KOSLOWE
AMANDA E. SHAFER
SHERI L. SHEPHERD
SHEARMAN & STERLING LLP
801 Pennsylvania Ave., N.W.
Washington, DC 20004
202-508-8000

GEORGE BRENT MICKUM IV
SPRIGGS & HOLLINGSWORTH
1350 "I" Street N.W.
Washington, DC 20005
202-898-5800

*Counsel for Petitioners*
*Additional Counsel Listed on Inside Cover*

JOSEPH MARGULIES
MACARTHUR JUSTICE CENTER
NORTHWESTERN UNIVERSITY
  LAW SCHOOL
357 East Chicago Avenue
Chicago, IL  60611
312-503-0890

MARK S. SULLIVAN
CHRISTOPHER G. KARAGHEUZOFF
JOSHUA COLANGELO-BRYAN
DORSEY & WHITNEY LLP
250 Park Avenue
New York, NY 10177
212-415-9200

DAVID H. REMES
COVINGTON & BURLING
1201 Pennsylvania Ave., N.W.
Washington, DC  20004
202-662-5212

SCOTT SULLIVAN
DEREK JINKS
UNIVERSITY OF TEXAS
  SCHOOL OF LAW
RULE OF LAW IN WARTIME
  PROGRAM
727 E. Dean Keeton Street
Austin, TX 78705
512-471-5151

STEPHEN YAGMAN
723 Ocean Front Walk
Venice, CA  90291
(310) 452-3200

JOHN J. GIBBONS
LAWRENCE S. LUSTBERG
GIBBONS P.C.
One Gateway Center
Newark, NJ  07102
973-596-4500

BAHER AZMY
SETON HALL LAW SCHOOL
CENTER FOR SOCIAL JUSTICE
833 McCarter Highway
Newark, NJ  07102
973-642-8700

MARC D. FALKOFF
COLLEGE OF LAW
NORTHERN ILLINOIS
  UNIVERSITY
DeKalb, IL 60115
815-753-0660

ERWIN CHEMERINSKY
DUKE LAW SCHOOL
Science Drive &
  Towerview Rd.
Durham, NC  27708
919-613-7173

CLIVE STAFFORD SMITH
JUSTICE IN EXILE
636 Baronne Street
New Orleans, LA  70113
504-558-9867

1

Contrary to the government's claim (Opp. 1-2), events since the Court denied certiorari demonstrate that the Court should reconsider that decision and grant review.[1] Specifically, the government's subsequent filings confirm that the review provided under the Detainee Treatment Act of 2005 ("DTA") can *never* be an adequate substitute for habeas and that there is no reason to delay determining the important question of whether the Military Commissions Act (MCA) deprives the Guantanamo detainees of constitutionally-protected rights.

1. After the Court denied certiorari, the government finally conceded that DTA review – exhaustion of which the government says is "a principal reason" to deny certiorari here (Opp. 4) – is more limited than, and not the equivalent of, habeas review. In *Bismullah*,[2] a pending DTA case, the government filed a brief urging the court of appeals not to extend to counsel for the detainees the same access to Guantanamo that the district court granted to them under habeas. The government stated:

> [T]he district court habeas regime should not be recreated in this Court because it is not appropriate to this Court's limited review under the DTA. . . . [T]he review here is administrative in nature and is on the record of the CSRT [Combatant Status Review Tribunal]. Accordingly, factual development at Guantanamo will not be necessary in pursuing this action – the broad access to Guantanamo by private counsel under the Habeas Protective Order is therefore not necessary.[3]

Thus, the government now admits that, under the DTA, the detainees will *not* be able to develop, and the court of

---

[1] "Opp." refers to the Brief for the Respondents in Opposition to the Petitions for Rehearing in No. 06-1195 and this case.

[2] *Bismullah v. Gates*, No. 06-1197 (D.C. Cir.).

[3] *Id.*, Resp. Br. Address. Pending Prelim. Mots. 32 (Apr. 9, 2007).

2

appeals will *not* be able to consider, plainly exculpatory evidence and other relevant facts outside the "record" of the CSRT that may determine the validity of their detention. The development and judicial consideration of such evidence and relevant facts, of course, is the *sine qua non* of habeas review.

2. The government also has conceded in its opposition to the petitions for rehearing that DTA review does not contemplate the judicial remedy of release from imprisonment, a remedy that is the hallmark of habeas. Instead, if the court of appeals concludes that the CSRT committed legal error and the detainee is not properly detained as an "enemy combatant," the government maintains that "a remand would be the appropriate remedy" (Opp. 7). The government speculates that such a remand "could" lead the CSRT to enter a finding that the detainee is not an "enemy combatant," and it says that, eventually, all detainees determined to be no longer enemy combatants have been released by the Defense Department (*Id.* 7-8).[4] However, the government does not suggest that, under the DTA, the court of appeals may order a release, even if it finds that there is *no* factual or legal basis for the detention.

Indeed, under the government's reading of the DTA, the Defense Department could hold a detainee forever, even where the court of appeals repeatedly invalidates a CSRT determination that a detainee is an "enemy combatant." Moreover, the government can avoid review by this Court through an endless loop of remands for further CSRT determinations followed by further DTA reviews, *ad infinitum*.

---

[4] In fact, detainees determined by CSRTs not to be properly detained as enemy combatants remained imprisoned at Guantanamo for months after the conclusion of the CSRT process before they were released by the Defense Department. *See* http://www. defenselink.mil/Releases.Release.aspx?ReleaseID=10204.

3

This is the inverse of the habeas process, where release is a matter of legal right and not executive grace.

3. In light of the government's concessions, if the detainees do have a right to habeas corpus protected by the Suspension Clause, as they maintain, then the review provided by the DTA can never be an adequate substitute for habeas and the revocation of their right to habeas by the MCA would appear to be unconstitutional. *See Sanders v. United States*, 373 U.S. 1, 14 (1963). The Court should grant certiorari to resolve this important question.

There is no reason to delay determination of whether the detainees have fundamental constitutional rights. The government, in its opposition, insists that, under the DTA, the court of appeals is authorized to consider petitioners' constitutional claims (Opp. 6). *See* DTA § 1005(e)(2)(C), 119 Stat. 2742. However, the court of appeals reiterated below (*Boumediene v. Bush*, 476 F.3d 981, 991-92 (D.C. Cir. 2007)), as it previously held in *Al Odah v. United States*, 321 F.3d 1134, 1140-41 (D.C. Cir. 2004), that, under its interpretation of *Johnson v. Eisentrager*, 339 U.S. 763 (1950), petitioners have no rights under the Constitution. Unless and until this Court reviews and reverses that erroneous holding, it is the unshakeable law of the circuit. *See Boumediene*, 476 F.3d at 1011 (Rogers, J., dissenting) ("Although in *Rasul* the Court cast doubt on the continuing vitality of *Eisentrager*, 542 U.S. at 475-79, absent an explicit statement by the Court that it intended to overrule *Eisentrager*'s constitutional holding, that holding is binding on this court").

Petitioners were accorded the right to the Great Writ three years ago in *Rasul v. Bush*, 542 U.S. 466 (2004). Now, in the *sixth year* of petitioners' unlawful detention under inhumane conditions of confinement, it would be nothing short of tragic to force petitioners to wait another year or more to first pursue a pointless remedy and receive another decision from the court of appeals that they have no constitutional

4

rights before they can raise this critical issue in this Court. *See* 127 S. Ct. 1478 (statement of Stevens & Kennedy, JJ., respecting denial of certiorari) (habeas corpus "does not require the exhaustion of inadequate remedies"); *Wilwording v. Swenson*, 404 U.S. 249, 250 (1971). That issue is ripe for decision now.

4. Finally, it is now clear that, not only is the remedy provided by the DTA inadequate, but also the underlying CSRT process was an irremediable sham. A courageous military officer, Lieutenant Colonel Stephen Abraham, United States Army Reserve, has come forward with a declaration responding to assertions about the adequacy of the CSRT process made on behalf of the government by Rear Admiral (Retired) James M. McGarrah in the *Bismullah* case. Based on his personal experience, first as a factual investigator and then as a member of a CSRT tribunal, Lieutenant Colonel Abraham avers that, in every phase, the CSRT process was infected with command influence and an illusion. *See* annexed Declaration of Stephen Abraham.

No review under the DTA can cure such a sham process. No remand by a court for such a process can be an adequate substitute for independent review by a habeas court. Therefore, no exhaustion of the DTA remedy should be required before certiorari is granted in this case.

5

## CONCLUSION

The Court should grant the Petition for Rehearing from Denial of *Certiorari*.

Respectfully submitted,

DAVID J. CYNAMON
MATTHEW J. MACLEAN
OSMAN HANDOO
PILLSBURY WINTHROP
 SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, DC 20037
202-663-8000

GITANJALI GUTIERREZ
J. WELLS DIXON
SHAYANA KADIDAL
CENTER FOR
 CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
212-614-6438

THOMAS B. WILNER
 COUNSEL OF RECORD
NEIL H. KOSLOWE
AMANDA E. SHAFER
SHERI L. SHEPHERD
SHEARMAN & STERLING LLP
801 Pennsylvania Ave., N.W.
Washington, DC 20004
202-508-8000

GEORGE BRENT MICKUM IV
SPRIGGS & HOLLINGSWORTH
1350 "I" Street N.W.
Washington, DC 20005
202-898-5800

*Counsel for Petitioners*
*With counsel listed on inside cover*

JUNE 22, 2007

i

## Appendix

### DECLARATION OF STEPHEN ABRAHAM
Lieutenant Colonel, United States Army Reserve

I, Stephen Abraham, hereby declare as follows:

1.    I am a lieutenant colonel in the United States Army Reserve, having been commissioned in 1981 as an officer in Intelligence Corps.  I have served as an intelligence officer from 1982 to the present during periods of both reserve and active duty, including mobilization in 1990 ("Operation Desert Storm") and twice again following 9-11.  In my civilian occupation, I am an attorney with the law firm Fink & Abraham LLP in Newport Beach, California.

2.    This declaration responds to certain statements in the Declaration of Rear Admiral (Retired) James M. McGarrah ("McGarrah Dec."), filed in *Bismullah v. Gates*, No. 06-1197 (D.C. Cir.).  This declaration is limited to unclassified matters specifically related to the procedures employed by Office for the Administrative Review of the Detention of Enemy Combatants ("OARDEC") and the Combatant Status Review Tribunals ("CSRTs") rather than to any specific information gathered or used in a particular case, except as noted herein. The contents of this declaration are based solely on my personal observations and experiences as a member of OARDEC.  Nothing in this declaration is intended to reflect or represent the official opinions of the Department of Defense or the Department of the Army.

3.    From September 11, 2004 to March 9, 2005, I was on active duty and assigned to OARDEC.  Rear Admiral McGarrah served as the Director of OARDEC during the entirety of my assignment.

4.    While assigned to OARDEC, in addition to other duties, I worked as an agency liaison, responsible for coordinating with government agencies, including certain Department of Defense ("DoD") and non-DoD organizations, to gather or

ii

validate information relating to detainees for use in CSRTs. I also served as a member of a CSRT, and had the opportunity to observe and participate in the operation of the CSRT process.

5.      As stated in the McGarrah Dec., the information comprising the Government Information and the Government Evidence was not compiled personally by the CSRT Recorder, but by other individuals in OARDEC. The vast majority of the personnel assigned to OARDEC were reserve officers from the different branches of service (Army, Navy, Air Force, Marines) of varying grades and levels of general military experience. Few had any experience or training in the legal or intelligence fields.

6.      The Recorders of the tribunals were typically relatively junior officers with little training or experience in matters relating to the collection, processing, analyzing, and/or dissemination of intelligence material. In no instances known to me did any of the Recorders have any significant personal experience in the field of military intelligence. Similarly, I was unaware of any Recorder having any significant or relevant experience dealing with the agencies providing information to be used as a part of the CSRT process.

7.      The Recorders exercised little control over the process of accumulating information to be presented to the CSRT board members. Rather, the information was typically aggregated by individuals identified as case writers who, in most instances, had the same limited degree of knowledge and experience relating to the intelligence community and intelligence products. The case writers, and not the Recorders, were primarily responsible for accumulating documents, including assembling documents to be used in the drafting of an unclassified summary of the factual basis for the detainee's designation as an enemy combatant.

8.      The information used to prepare the files to be used by the Recorders frequently consisted of finished intelligence

iii

products of a generalized nature - often outdated, often "generic," rarely specifically relating to the individual subjects of the CSRTs or to the circumstances related to those individuals' status.

9.      Beyond "generic" information, the case writer would frequently rely upon information contained within the Joint Detainee Information Management System ("JDIMS"). The subset of that system available to the case writers was limited in terms of the scope of information, typically excluding information that was characterized as highly sensitive law enforcement information, highly classified information, or information not voluntarily released by the originating agency. In that regard, JDIMS did not constitute a complete repository, although this limitation was frequently not understood by individuals with access to or who relied upon the system as a source of information. Other databases available to the case writer were similarly deficient. The case writers and Recorders did not have access to numerous information sources generally available within the intelligence community.

10.     As one of only a few intelligence-trained and suitably cleared officers, I served as a liaison while assigned to OARDEC, acting as a go-between for OARDEC and various intelligence organizations. In that capacity, I was tasked to review and/or obtain information relating to individual subjects of the CSRTs. More specifically, I was asked to confirm and represent in a statement to be relied upon by the CSRT board members that the organizations did not possess "exculpatory information" relating to the subject of the CSRT.

11.     During my trips to the participating organizations, I was allowed only limited access to information, typically prescreened and filtered. I was not permitted to see any information other than that specifically prepared in advance of my visit. I was not permitted to request that further searches

iv

be performed. I was given no assurances that the information
provided for my examination represented a complete compi-
lation of information or that any summary of information
constituted an accurate distillation of the body of available
information relating to the subject.

12.    I was specifically told on a number of occasions that
the information provided to me was all that I would be
shown, but I was never told that the information that was
provided constituted all available information. On those oc-
casions when I asked that a representative of the organization
provide a written statement that there was no exculpatory
evidence, the requests were summarily denied.

13.    At one point, following a review of information, I
asked the Office of General Counsel of the intelligence or-
ganization that I was visiting for a statement that no exculpa-
tory information had been withheld. I explained that I was
tasked to review all available materials and to reach a conclu-
sion regarding the non-existence of exculpatory information,
and that I could not do so without knowing that I had seen all
information.

14.    The request was denied, coupled with a refusal even
to acknowledge whether there existed additional information
that I was not permitted to review. In short, based upon the
selective review that I was permitted, I was left to "infer"
from the absence of exculpatory information in the materials
I was allowed to review that no such information existed in
materials I was not allowed to review.

15.    Following that exchange, I communicated to Rear
Admiral McGarrah and the OARDEC Deputy Director the
fundamental limitations imposed upon my review of the or-
ganization's files and my inability to state conclusively that
no exculpatory information existed relating to the CSRT sub-
jects. It was not possible for me to certify or validate the
non-existence of exculpatory evidence as related to any indi-
vidual undergoing the CSRT process.

v

16.     The content of intelligence products, including data-bases, made available to case writers, Recorders, or liaison officers, was often left entirely to the discretion of the or-ganizations providing the information.  What information was not included in the bodies of intelligence products was typically unknown to the case writers and Recorders, as was the basis for limiting the information.  In other words, the person preparing materials for use by the CSRT board mem-bers did not know whether they had examined all available information or even why they possessed some pieces of in-formation but not others.

17.     Although OARDEC personnel often received large amounts of information, they often had no context for deter-mining whether the information was relevant or probative and no basis for determining what additional information would be necessary to establish a basis for determining the reasonableness of any matter to be offered to the CSRT board members.  Often, information that was gathered was dis-carded by the case writer or the Recorder because it was con-sidered to be ambiguous, confusing, or poorly written.  Such a determination was frequently the result of the case writer or Recorder's lack of training or experience with the types of in-formation provided.  In my observation, the case writer or Recorder, without proper experience or a basis for giving context to information, often rejected some information arbi-trarily while accepting other information without any articu-lable rationale.

18.     The case writer's summaries were reviewed for qual-ity assurance, a process that principally focused on format and grammar.  The quality assurance review would not ordi-narily check the accuracy of the information underlying the case writer's unclassified summary for the reason that the quality assurance reviewer typically had little more experi-ence than the case writer and, again, no relevant or meaning-ful intelligence or legal experience, and therefore had no

vi

skills by which to critically assess the substantive portions of the summaries.

19.    Following the quality assurance process, the unclassified summary and the information assembled by the case writer in support of the summary would then be forwarded to the Recorder. It was very rare that a Recorder or a personal representative would seek additional information beyond that information provided by the case writer.

20.    It was not apparent to me how assignments to CSRT panels were made, nor was I personally involved in that process. Nevertheless, I discerned the determinations of who would be assigned to any particular position, whether as a member of a CSRT or to some other position, to be largely the product of ad hoc decisions by a relatively small group of individuals. All CSRT panel members were assigned to OARDEC and reported ultimately to Rear Admiral McGarrah. It was well known by the officers in OARDEC that any time a CSRT panel determined that a detainee was not properly classified as an enemy combatant, the panel members would have to explain their finding to the OARDEC Deputy Director. There would be intensive scrutiny of the finding by Rear Admiral McGarrah who would, in turn, have to explain the finding to his superiors, including the Under Secretary of the Navy.

21.    On one occasion, I was assigned to a CSRT panel with two other officers, an Air Force colonel and an Air Force major, the latter understood by me to be a judge advocate. We reviewed evidence presented to us regarding the recommended status of a detainee. All of us found the information presented to lack substance.

22.    What were purported to be specific statements of fact lacked even the most fundamental earmarks of objectively credible evidence. Statements allegedly made by percipient witnesses lacked detail. Reports presented generalized statements in indirect and passive forms without stating the

vii

source of the information or providing a basis for establish-
ing the reliability or the credibility of the source. Statements
of interrogators presented to the panel offered inferences
from which we were expected to draw conclusions favoring a
finding of "enemy combatant" but that, upon even limited
questioning from the panel, yielded the response from the
Recorder, "We'll have to get back to you." The personal rep-
resentative did not participate in any meaningful way.

23.     On the basis of the paucity and weakness of the in-
formation provided both during and after the CSRT hearing,
we determined that there was no factual basis for concluding
that the individual should be classified as an enemy combat-
ant. Rear Admiral McGarrah and the Deputy Director im-
mediately questioned the validity of our findings. They di-
rected us to write out the specific questions that we had
raised concerning the evidence to allow the Recorder an op-
portunity to provide further responses. We were then ordered
to reopen the hearing to allow the Recorder to present further
argument as to why the detainee should be classified as an
enemy combatant. Ultimately, in the absence of any substan-
tive response to the questions and no basis for concluding
that additional information would be forthcoming, we did not
change our determination that the detainee was not properly
classified as an enemy combatant. OARDEC's response to
the outcome was consistent with the few other instances in
which a finding of "Not an Enemy Combatant" (NEC) had
been reached by CSRT boards. In each of the meetings that I
attended with OARDEC leadership following a finding of
NEC, the focus of inquiry on the part of the leadership was
"what went wrong."

24.     I was not assigned to another CSRT panel.

        I hereby declare under the penalties of perjury based
on my personal knowledge that the foregoing is true and ac-
curate.

viii

Stephen Abraham

Dated: June 15, 2007

# Exhibit C

**CERTIORARI GRANTED**

06-1195  BOUMEDIENE, LAKHDAR, ET AL. V. BUSH PRESIDENT OF U.S., ET AL.

06-1196  AL ODAH, KHALED A. F., ET AL. V UNITED STATES, ET AL.

     The petitions for rehearing are granted. The orders entered April 2, 2007, denying the petitions for writs of certiorari are vacated. The petitions for writs of certiorari are granted. The cases are consolidated and a total of one hour is allotted for oral argument. As it would be of material assistance to consult any decision in *Bismullah*, *et al.*, v. *Gates*, No. 06-1197, and *Parhat, et al.*, v. *Gates*, No. 06-1397, currently pending in the United States Court of Appeals for the District of Columbia Circuit, supplemental briefing will be scheduled upon the issuance of any decision in those cases.