UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOHAMMED ABDUL RAHMAN AL-SHIMRANI, Guantánamo Bay, Cuba. ) ) ) ) ) Petitioner, ) ) v. ) ) BARACK HUSSEIN OBAMA, *et al.*, ) ) Respondents. ) ) | Civil Action No: 05-2249 (RMC) |

## PETITIONER'S MOTION FOR EXPEDITED JUDGMENT ON THE GOVERNMENT'S RECORD

Petitioner Mohammed Abdul Rahman Al-Shimrani respectfully moves this Court for an order granting his habeas corpus petition and releasing him from United States custody. Respondents' Amended Factual Return, even if accurate, does not provide a legal and factual basis for Petitioner's current and continuing detention. As such, this particular Guantanamo habeas petition can be expeditiously and efficiently resolved. Since, solely for the purpose of this motion, Petitioner does not challenge the allegations contained in Respondents' Amended Factual Return, nor does Petitioner challenge that those allegations establish he is an "enemy combatant," by whatever definition Respondents' urge on this Court, Petitioner requests that this Court consider the instant motion in lieu of a traverse at this time.[1]

---

[1] Petitioner does not waive his right to traverse and requests that his time to do so be extended, should such be necessary, until after a decision on this motion. Respondents' Department of Justice lawyer in charge of this matter, Peter J. McVeigh, opposes this request.

Respondents' authority to detain Petitioner as an "enemy combatant" emanates solely from the Authorization for Use of Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), and is limited by traditional law-of-war principles. *Hamdi v. Rumsfeld*, 542 U.S. 507, 521 (2004). The law of war forbids detention for the purposes of punishment or interrogation: combatant wartime detention is only permissible *to prevent return to the battlefield. Id.* at 518. The law-of-war principle recognized by the *Hamdi* plurality, permitting detention until the end of hostilities, does not permit otherwise. If the detention does not serve the only legitimate basis for wartime detention of combatants, it is not authorized under the AUMF.

Respondents' Amended Factual Return does not establish a factual basis for Petitioner's current and continuing detention. Respondents' sole focus on Petitioner's designation as an "enemy combatant" only attempts to establish that Petitioner was the right *person* being held and fails to establish that Petitioner was detained and continues to be detained for the right *purpose*. And Respondents' designation of Petitioner as "not approved to leave Guantanamo" through its annual review process has no probative value. Rather, by employing standards wholly untethered from the law of war, the annual review process shows Guantánamo's true colors: a far-reaching preventive detention regime. In addition, Respondents' own records reveal that scores of former detainees have been released from United States custody without approval through this process. Respondents have made clear Petitioner is not designated for trial by military commission and there are no diplomatic obstacles to Petitioner's repatriation. Petitioner is unquestionably a citizen of Saudi Arabia, a strong and long-time ally of the United States, whose post-detention reintegration program has been fully approved by the United States.

For all of foregoing reasons, elaborated upon in the attached Petitioner's Memorandum in Support of Motion for Expedited Judgment on the Government's Record, Petitioner seeks an order granting his habeas corpus petition and ordering his release from U.S. custody.

Dated: New York, New York
      February 12, 2009

Respectfully submitted,

Counsel for Petitioner:

_____
Martha Rayner (NY-MR-1423)
Lincoln Square Legal Services
Fordham University School of Law
33 West 60th Street, 3d Floor
New York, NY 10023
Telephone: (212) 636-6934
Fax: (212) 636-6923

UNCLASSIFIED//FOR PUBLIC RELEASE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MOHAMMED ABDUL RAHMAN AL-SHIMRANI, Guantánamo Bay, Cuba. | ) ) ) ) ) |
| Petitioner, | ) ) ) |
| v. | ) ) ) |
| BARACK HUSSEIN OBAMA, *et al.*, | ) ) ) |
| Respondents. | ) ) |

Civil Action No: 05-2249 (RMC)

## PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S MOTION FOR EXPEDITED JUDGMENT ON THE GOVERNMENT'S RECORD

Respectfully submitted,
Martha Rayner (NY-MR-1423)
Lincoln Square Legal Services
Fordham University School of Law

Sapphira Al Rais
Nathan Fudge
Elaine K. Lou
Melissa Mohan
George C. O'Loughlin
Elizabeth Shura
Legal Interns

On the Memorandum

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

## **Table of Contents**

Introduction ............................................................................................ 4

Background and Statement of Facts .................................................... 7

Argument ............................................................................................. 19

I.     Authority to Detain Petitioner Is Based on the AUMF,
Which Must Be Interpreted Through Traditional Law-of-War Principles ............ 19

II.    Traditional Law-of-War Principles Place Explicit Limits
on the Purpose of Combatant Wartime Detention ....................................... 21

     A.   Respondents May Not Detain Petitioner for Punitive Purposes ................... 22

     B.   Respondents May Not Detain Petitioner for the Purpose of Interrogation ........ 23

     C.   Respondents May Only Detain Petitioner for the Purpose of Preventing
Return to the Battlefield ................................................................. 24

     D.   The Law of War Does Not Permit Detention
Until the End of the Relevant Hostilities for Any Purpose
Other Than Preventing Return to the Battlefield ....................................... 25

III.   Respondents' Factual Return Does Not Establish
a Proper Basis for Petitioner's Current and Continuing Detention .................... 27

IV.   Respondents Cannot Justify Petitioner's Current and Continuing Detention ......... 28

     A.   There Are No Diplomatic Obstacles to Repatriation ............................... 29

     B.   Respondents' Annual Review Process Which Purports to Decide
Who is Released or Transferred is a Sham ............................................ 32

         1.   The Annual Review Process Does Not Apply
Permissible Standards Under the Law of War ........................................ 32

         2.   Approval for Release or Transfer Through the Annual Review Process
Is Not a Prerequisite to Release or Transfer ............................... 36

         3.   Approval for Release or Transfer Through the Annual Review Process Is
Not Contingent on the Gravity of Respondents' Allegations ........... 38

     C.   Petitioner Has Not Been Charged by Military Commission ...................... 40

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

V.    Under Fundamental Canons of Construction,
      the AUMF Cannot Be Read to Authorize Detention
      Beyond That Permitted Under the Law of War ........................................... 40

      A.  Congressional Delegation of Law-Making Powers Requires
          Both a Clear Statement of Intent and Substantive Guidance by Congress ........ 41

      B.  A Second Canon of Construction Requires Statutes
          to Be Narrowly Construed When Individual Liberty Is at Stake ................... 43

      C.  Constructions That Depart From Accepted Norms
          of International Law Must Be Avoided Absent a Clear Indication of
          Congressional Intent ................................................................. 44

Conclusion ...................................................................................... 44

UNCLASSIFIED//FOR PUBLIC RELEASE

### Introduction

Respondents' Amended Factual Return, even if accurate, which it is not, does not

establish a lawful purpose, under traditional law-of-war principles, for Mr. Al-Shimrani's current

and continuing detention, now seven solid years and counting.[1]  The only lawful purpose for

detention of combatants in an armed conflict is "to prevent captured individuals from returning

to the field of battle and taking up arms once again." *Hamdi v. Rumsfeld*, 542 U.S. 507, 518

(2004).  Even if Petitioner's initial detention, dating back to 2001 when he first came into U.S.

military custody, was justified, which Petitioner in no way concedes, there is simply no longer

any legal or factual basis for his current and continuing imprisonment.  Thus, Petitioner requests

this Court find that Respondents' Amended Factual Return, as a matter of law and fact, does not

establish authority for Petitioner's current and continuing imprisonment and order Mr. Al-

Shimrani's release from United States' custody.

Notwithstanding the fundamental law-of-war principle that wartime combatants may be

held until the end of hostilities, such detention must be for the proper purpose   preventing return

to the battlefield.  That purpose, if it ever existed as to Mr. Al-Shimrani, vanished long ago and

cannot be established by Respondents.  The *Hamdi* plurality's recognition that proper military

detention of combatants during armed conflict permits detention until the end of the "particular

conflict" in which a combatant is captured was fully tethered to the purpose of that detention   it

cannot be read to extend the duration of detention for an improper purpose.  Detention during

---

[1] Judge Hogan made clear that a habeas court's obligation is to "determine whether continued detention is lawful . . . ." Order Granting Resp'ts' Mot. to Amend the Factual Return (dkt. no. 116 at 3).  Judge Hogan further established that a petitioner may challenge his continued detention in front of a habeas court in both his original and amended Case Management Orders. (dkt. no. 112 at I.G; dkt. no. 131 at 5.G (*citing Boumediene v. Bush*, 128 S. Ct. 229, 2273 (2008) ("If a detainee can present reasonably available evidence demonstrating there is no basis for his continued detention, he must have the opportunity to present this evidence to a habeas corpus court."))).

armed-conflict is not unbounded.  Who may be detained, for what purpose, under what conditions of confinement and for how long is regulated by the law of war.  Respondents cannot invoke law-of-war authority to detain a combatant until the end of hostilities unless the detention adheres to the only legitimate purpose for combatant wartime detention:  preventing return to the field of battle.

It is a misconception of the law of war to reflexively assume that authority to detain initially automatically establishes authority to detain until the end of hostilities.  To be sure, in classic international armed conflicts, when belligerent states are at war, combatant detention will typically last until the end of hostilities and such will be permissible under law-of-war principles because repatriation of an enemy combatant to an enemy nation will *automatically* mean return to the battlefield.  But that is not the case here.

The nature of the relevant and particular armed conflict in which Petitioner was captured, as well as the temporal and geographic confines of that conflict, are highly contested, but there is no question that the conflict in its current incarnation is unlike a traditional armed conflict between warring nations, wherein release of combatants to an enemy nation assures return to the battlefield.  Petitioner is a citizen of Saudi Arabia, not an enemy nation.  On the contrary, Saudi Arabia is a strong United States ally in the war against terrorism.  Approximately 2█ Saudis were held at Guantánamo, almost all have been repatriated pursuant to a bilateral agreement between the United States and Saudi Arabia brokered years ago.

There is simply no lawful basis for Petitioner's continuing detention.  There are no diplomatic obstacles to Petitioner's repatriation   Saudi Arabia recognizes his citizenship and seeks his release.  Saudi Arabia has established a reintegration program into which the United States has repatriated the well over 100 Saudi nationals released to date.  Notwithstanding recent

reports that former Saudi detainees have rejoined "the fight," the United States has stood by the Saudi program. Respondents' allegations against Petitioner are similar to those leveled against scores of Saudis who have already gone home. And Petitioner has never been charged under any of the military commission regimes established by Respondents and there has never been any indication of intent to do so.

Petitioner's lack of "approv[al]" to leave Guantanamo by the Department of Defense's ("DoD") yearly review process, the Administration Review Board ("ARB"), has no legal significance and does not in and of itself prove a legitimate basis for years and years of imprisonment. Scores of detainees have been repatriated without this so-called "approv[al]" and many with allegations similar to those lodged against Petitioner. Respondents' yearly review process engages in a far-flung inquiry determining whether to continue detention based on an assessment of a detainee's intelligence value, threat assessment, and other factors that have no nexus to the only proper purpose for detention, preventing return to the battlefield. If anything, Respondents' yearly review process illustrates that Guantánamo is a far-reaching preventive detention regime engaged in predicting dangerousness and intelligence value, but having little to do with traditional law-of-war principles and thus vastly exceeding the "narrow set of circumstances" in which the *Hamdi* plurality authorized detention.

Mr. Al-Shimrani has now been detained for over seven years. There is no factual or legal justification for his continued detention. Petitioner seeks an order granting his habeas petition on the ground Respondents have not met their burden of proving authority for his current and

continuing detention. Respondents have not and cannot. This motion seeks an efficient and

rapid resolution of this particular Guantánamo habeas matter.[2]

## **Background and Statement of Facts**

Petitioner Mohammed Al-Shimrani is a 33-year-old high-school teacher from Riyadh,

Saudi Arabia. *See* Resp'ts' Am. Factual Return, ISN 195 FD-302 at 1, April 11, 2002; Resp'ts'

Am. Factual Return, Narrative for Mohammed Abd Al-Rahman Al-Shumrant, ISN 195 ¶¶ 1, 18

[hereinafter Narrative]. His mother, brothers, sisters, and extended family await his return, and

are committed to assisting in his reintegration back into life in Saudi Arabia. ISN 195 FD-302 at

8-9; *see also* Ex. 1, Decl. of Martha Rayner at ¶ 12 [hereinafter Rayner Decl.]. They hope to

help him find a wife and employment, and have built an apartment for Petitioner within their

house, where they would welcome him upon his release. *Id.*

Mr. Al-Shimrani has been in U.S. Military custody since December 2001, when

according to Respondents, "he surrendered his weapon to unknown tribes at the Pakistani border,

and was captured by the Pakistani Military upon crossing the border." Narrative at ¶ 14. This

was after Mr. Al-Shimrani allegedly "fled from U.S. and allied forces." Narrative at ¶ 1. He was

one of the first men transported to the naval base at Guantánamo Bay, Cuba, where he has been

imprisoned since January ▮ 2002. *See* Ex. 2, Capture Card for Prisoner of War. He has been

interrogated at least eighty-eight times as of July, 2007, covering a period of approximately five

years, and is likely to have been further interrogated since that time. *See* Rayner Decl. at ¶ 8. No

war crimes charges have ever been leveled against him nor has there been any indication that

---

[2]Petitioner also seeks an extension of time to file his traverse, until after the Court's
decision on the instant motion, should such be necessary. Respondents oppose this request.
Petitioner reserves the right to traverse Respondents' Amended Factual Return and challenge the
lawfulness of his initial detention.

charges will be brought against him. *See* Resp'ts' Notice of Filing of Detainee Info. Pursuant to

the Ct.'s Jan. 14, 2009 Order, Ex. 1 (dkt. no. 148-1 at 2); *see also* Resp'ts' Status Reports and

Resp. to Ct.'s July 11, 2008 Order, Ex. 1, Part 4 (dkt. no. 78-5 at 51).

Petitioner's "capture" in December of 2001 occurred soon after the United States'

October 7, 2001, invasion of Afghanistan and the mid-November fall of Afghanistan's Taliban-

led government. Dexter Filkins, *A Nation Challenged: Rise and Fall; The Legacy of the Taliban

Is a Sad and Broken Land*, N.Y. Times, Dec. 31, 2001, *available at*

http://query.nytimes.com/gst/fullpage.html?res 9C07E4DF1430F932A05751C1A9679C8B63&

sec &spon &pagewanted 1. Thousands[3] of Afghan and foreign men whom the U.S. declared

"enemy combatants" were taken prisoner both from within Afghanistan and the Pakistani border

regions. Resp'ts' Mot. to Dismiss Pet'rs' First Am. Pet. for Writ of Habeas Corpus, *Rasul v.

Bush*, No. 02-0299 (CKK) (D.D.C. March 18, 2002).  But only a small subset of those men were

shipped to Guantánamo.  By Respondents' own calculations, over the course of seven years

approximately 779 men have been imprisoned at Guantánamo.  The bulk of the men imprisoned

to date, were transported to Guantánamo from United States military prisons in Afghanistan.[4]

The Hon. Patricia M. Wald, *Foreword* to Laurel E. Fletcher & Eric Stover, Guantánamo and its

---

[3] Though the Government claims that they have detained thousands of Afghan and foreign men, reports indicate that they have detained tens of thousands of Afghan and foreign men. *See*, Andrew C. McCarthy, *It's Not the Prison, It's the Prisoners*,  National Review Online, February 10, 2009, *available at* http://article.nationalreview.com/?q MDNlMTYxYjNjMWQwMGMzYTg1NGQ4MjMzNWY wMDQ1MDc #more.

[4] Scores of men transferred to Guantánamo also came from secret CIA detention sites. *See* Jane Mayer, *The Black Sites: A Rare Look Inside the C.I.A.'s Secret Interrogation Program*, The New Yorker, Aug. 13, 2007, *available at* http://www.newyorker.com/reporting/2007/08/13/070813fa_fact_mayer (noting secret C.I.A. program detaining terror suspects in "secret prisons outside the United States" was "effectively suspended last fall, when President Bush announced that he was emptying the C.I.A.'s prisons and transferring the detainees to military custody in Guantánamo.").

Aftermath vii (Human Rights Ctr. and Int'l Human Rights Law Clinic, Univ. of Cal., Berkeley, 2008).

According to Respondents, the men chosen to be transferred were those "whom the U.S. military determine[d] ha[d] a high potential intelligence value *or* pose[d] a particular threat." Br. for the Resp'ts at 4, *Rasul v. Bush*, 542 U.S. 466 (2004) (No. 03-334) (emphasis added); *see also* 2008 Joint Task Force Guantanamo Pub. Affairs Office, *available at* http://www.jtfgtmo.southcom.mil/about.html#gtmo ("Guantanamo remains a strategic intelligence resource.").[5] Respondents' "particular threat" justification for transfer appears to have been hyperbole, since over two-thirds of those transferred have been released. *See The Guantánamo Docket: The Detainees*, N.Y. Times, *available at* http://projects.nytimes.com/guantanamo [hereinafter "Guantanamo Docket"] ("Of the 779 people who have been detained at . . . Guantánamo Bay, Cuba, 532 have been transferred and 242 remain . . . ."). Rather, Respondents engineered the transfer of prisoners to Guantánamo to create a location away from the battlefield at which to interrogate prisoners, relying on legal opinions that placed the base and the men imprisoned there beyond the reach of our courts and the procedural and substantive protections that would unquestionably apply to prisoners in the United States. Mem. from the Office of Legal Counsel, Dep't of Justice, for William J. Haynes, General Counsel, Dep't of Def., Possible Habeas Jurisdiction over Aliens Held in Guantánamo Bay, Cuba, Dec. 28, 2001.

---

[5] But note that the screening criteria governing decisions on transfers to Guantánamo is classified. *See* Resp'ts' Response to, and Mot. to Dismiss, Pet. for a Writ of Habeas Corpus at n.1, *Hamdi v. Rumsfeld*, No. 02-439 (July 25, 2002).

Respondents openly promoted the primacy of interrogation at Guantánamo as the foremost reason why our courts should refrain from reviewing the legality of the detentions there:

> The intelligence-gathering operations at Guantánamo are an integral component of the military's efforts to "repel and defeat the enemy" in the ongoing military campaign being waged not only in Afghanistan but around the globe.   Any judicial review of the military's operations at Guantánamo would directly intrude on those important intelligence-gathering operations.   Moreover, any judicial demand that the Guantánamo detainees be granted access to counsel to maintain a habeas action would in all likelihood put an end to those operations     a result that not only would be very damaging to the military's ability to win the war, but no doubt be "highly comforting to enemies of the United States."

Br. for the Resp'ts in Opp'n at 54, *Rasul v. Bush*, No. 02-0299 (CKK) (D.D.C. Mar. 3, 2003) (emphasis added) (citations omitted).

Respondents' plan has turned out to be quite effective:  merits decisions on habeas petitions emanating from prisoners at Guantánamo were blocked for six and a half years while interrogations proceeded apace, accompanied by torture. Bob Woodward, *Detainee Tortured, Says U.S. Official*, Wash. Post, Jan. 14, 2009, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2009/01/13/AR2009011303372.html.  Respondents' Amended Factual Return reveals that interrogations directed at Petitioner took place over the course of at least five years.  The Amended Factual Return relies on statements Petitioner allegedly made during interrogations starting [2] ███████████ just a few months after he arrived at Guantánamo, and running until as late as [2] ███████████ five years later. Resp'ts' Am. Factual Return, ISN 195 MFR, Mar. 20, 2002; Resp'ts' Am. Factual Return, ISN 195 SIR, Mar. 21, 2007.  There is no question that "Guantánamo is first and foremost an intelligence operation." Tr. of the Status Hr'g before the Hon. Judge Thomas F. Hogan at 28, *In re Guantánamo Bay Detainee Litig.*, Misc. No. 08-442 (TFH) (D.D.C., Dec. 10, 2008).

UNCLASSIFIED//FOR PUBLIC RELEASE

Moreover, ███████████████████. *See* Ex. 4, Classified Annex.

From the beginning, the camps of Guantánamo were never intended to be temporary facilities for wartime prisoners. Just eleven days after the first men were relocated there, Marine Brigadier General Mike Lehnert declared a plan to build a more permanent prison, Lynne Sladky, *More Scrutiny on Suspects' Treatment*, Associated Press, (Jan. 22, 2002), and just weeks later U.S. officials stated they envisioned the naval base as a "terrorist penal colony" for years to come. John Mintz, *Extended Detention in Cuba Mulled*, Wash. Post (Feb. 13, 2002) at A16. True to their word, Respondents constructed two permanent prisons at Guantánamo: Camp 5, which opened in May 2004 and cost $31 million to build, now houses up to 100 prisoners, GlobalSecurity.org, Guantanamo Bay   Camp Delta, http://www.globalsecurity.org/military/facility/guantanamo-bay_delta.htm, and Camp 6, which opened on December 7, 2006 and cost $37 million, now houses up to 178 prisoners, *U.S. Military Transfers First Detainees to New Prison at Guantánamo Bay*, Associated Press, (Dec. 8, 2006), *available at* http://www.usatoday.com/news/world/2006-12-08-guantanamo_x.htm.

Over the course of Guantánamo's ignominious history, over 135 Saudi nationals have been held at Guantánamo; only [2] ██████ ow remain. *The Guantánamo Docket, Saudi Arabia*, N.Y. Times, *available at* http://projects.nytimes.com/Guantanamo/country/saudi-arabia [hereinafter Guantanamo Docket Saudi Arabia]. The Saudi government has recognized Mr. Al-Shimrani as one of the remaining Saudis whose repatriation they actively seek, *See* Rayner Decl. at ¶ 6, and as such has been specifically screened by his home nation as acceptable for repatriation into their comprehensive reintegration program. *Id.*

The timing and pattern of Saudi repatriations indicates that in early 2006, the United States and Saudi Arabia struck an agreement to facilitate an end to U.S. Military detention of

UNCLASSIFIED//FOR PUBLIC RELEASE

Saudi citizens. The first Saudi nationals to be repatriated, a group of five, left Guantánamo on May 6, 2003. Only four more Saudis were sent home over the course of the next three years. *See The Guantánamo Docket: Timeline*, N.Y. Times, *available at* http://projects.nytimes.com/guantanamo/timeline [hereinafter Guantanamo Docket Timeline]. But in April of 2006, fifteen Saudi nationals were sent home, beginning a trend that would result in 108 Saudis being repatriated over the course of the next year and a half. *See* Ex. 5, Turki Al-Umari, *Guantanamo Returnees Are Freed of Their Psychological Disorders and Worries as Soon as They Get on the Airplane*, Al Riyadh (Saudi Arabia), Feb. 15, 2008, at 10 (listing names of Saudi nationals and their repatriation dates). Since December 29, 2007, however, no Saudis have been repatriated. *Id.* at 11. Although Saudi Arabia has made clear that it seeks repatriation of Mohammed Al-Shimrani, he inexplicably remains in United States custody.

It is no wonder that almost all Saudi nationals have been sent home since repatriating a Saudi national to his home country means delivering him into the hands of a strong and long time ally rather than into the arms of an enemy nation or group. Since 1933 the U.S. and Saudi Arabia have engaged in open diplomatic relations, which have steadily grown stronger since the discovery of oil and the consequent increased U.S. presence in the region. Josh Pollack, *Saudi Arabia and the United States, 1931-2002*, Middle Eastern Review of International Affairs, Vol. 6 No. 3 (Sept. 2002) *available at* http://meria.idc.ac.il/journal/2002/issue3/jv6n3a7.html. The Saudi and American Governments share common concerns regarding regional security and oil exports and imports. Saudi Arabia has also closely cooperated with the U.S. on many international, economic, and development issues. *See* CRS Issue Brief for Congress, *Saudi Arabia: Current Issues and U.S. Relations*, updated May 2, 2002, *available at* http://fpc.state.gov/documents/organization/10859.pdf. In terms of economic ties, the State

UNCLASSIFIED//FOR PUBLIC RELEASE

Department reports that "[t]he U.S. is Saudi Arabia's largest trading partner, and Saudi Arabia is the largest U.S. export market in the Middle East." U.S. Dep't of State, Bureau of Near E. Affairs, Jan. 2009, *available at* http://www.state.gov/r/pa/ei/bgn/3584.htm.  Most significantly, the same report goes on to state that the two countries have maintained a long-standing security relationship and that "Saudi Arabia is an important partner in the campaign against terrorism." *Id.*; *see also* Info. Office, Royal Embassy of Saudi Arabia, The Kingdom of Saudi Arabia Initiatives and Actions to Combat Terrorism 5 (May 2008), *available at* http://www.saudiembassy.net/Reports.asp ("Ambassador J. Cofer Black, Coordinator for Counterrorism, stated: 'I would cite Saudi Arabia as an excellent example of a nation increasingly focusing its political will to fight terrorism. Saudi Arabia has launched an aggressive, comprehensive, and unprecedented campaign to hunt down terrorists, uncover their plots, and cut off their sources of funding.'").

In addition, Saudi Arabia's creation of a comprehensive rehabilitation program has been central to the transfer of over 100 Saudis during the period between April 2006 and December 2007.  To address Saudi Arabia's own internal security concerns and broader counter-terrorism issues, the Saudi Interior Ministry instituted the *Munasaha* program in 2004. Katherine Zoepf, *Deprogramming Jihadists*, N.Y. Times Magazine, Nov. 7, 2008 *available at* http://www.nytimes.com/2008/11/09/magazine/09jihadis-t.html?pagewanted 1&tntemail1 y&_r 3&emc tnt [hereinafter Zoepf, *Deprogramming Jihadists*, N.Y.Times Mag.].  All men repatriated from Guantánamo are entered into the program on arrival in Riyadh, including those cleared of suspected extremist activity.  Those about whom the Saudi government has particular concerns, or who have broken Saudi laws, may spend time in a Saudi prison before being entered into the program. Human Rights Watch, *Saudi Arabia:*

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

*Guantánamo Detainees Return to Legal Limbo*, May 25, 2006, *available at*:

http://www.hrw.org/en/news/2006/05/25/saudi-arabia-guantanamo-detainees-return-legal-limbo

(noting that some men transferred to Saudi Arabia from Guantánamo have been held in Riyadh's

al Ha'ir prison without charge or trial for up to two years). The Saudi rehabilitation program has

been praised by U.S. State Department officials and suggested as a model to emulate for other

nations with high numbers of detainees at Guantánamo. Dan Ephron, *Life After Gitmo*,

Newsweek, Nov. 26, 2008, *available at* http://www.newsweek.com/id/170997/page/1

[hereinafter Ephron, *Life After Gitmo*, Newsweek] (quoting Vijay Padmanabhan, former attorney

advisor in the State Department with responsibility for detainee issues, as saying "the U.S.

government has been very happy with the way the Saudi government has conducted itself with

respect to the rehabilitation program"); Gregory D. Johnsen and Christopher Boucek, *The*

*Dilemma of the Yemeni Detainees at Guantanamo Bay*, CTC Sentinel, Nov. 12, 2008 at 4,

*available at*

http://www.carnegieendowment.org/publications/index.cfm?fa view&id 22432&prog zgp&pro

j zme (discussing plans for a reintegration program in Yemen "[t]o be modeled in part on Saudi

Arabia's relatively successful program to care for Guantanamo returnees").

        The program serves to reeducate, rehabilitate and reintegrate typically young Saudi men

who have been involved in Islamic extremist activity. *See* Christopher Boucek, Saudi Arabia's

"Soft" Counterterrorism Strategy: Prevention, Rehabilitation, and Aftercare, Carnegie

Endowment for International Peace, September 2008, *available at*

http://www.carnegieendowment.org/publications/index.cfm?fa view&id 22155&prog zgp&pro

j zme. Participants in the program are placed in intensive Islamic reeducation classes, focused

on undoing the misguided Islamic teachings that had previously attracted them to extremist

UNCLASSIFIED//FOR PUBLIC RELEASE

groups. Zoepf, *Deprogramming Jihadists*, N.Y. Times Mag.  As well as correcting theological

misunderstandings, the program integrates psychological and social counseling. *Id.*  Saudi Arabia

is a family-centered society, and the rehabilitation program enlists the support of participants'

families throughout the process   eventually releasing the men into their care. *Id.*  At the end of

the detention phase of the program, graduates must sign a pledge to disavow extremism, which

the head of their household must also sign. *Id.*; *see also* Ephron, *Life After Gitmo*, Newsweek.

On release, Saudi security services, among the most effective in the world, continue to

monitor graduates, who are prohibited from leaving the Kingdom.  Post-release rehabilitation,

aimed at establishing a stable foundation, includes assistance in finding gainful employment or

resuming studies, and financial assistance for housing, a car, and the costs associated with

getting married. Zoepf, *Deprogramming Jihadists*, N.Y. Times Mag.; Jeffrey Fleishman, *Saudi

Arabia Tries To Rehab Radical Minds*, L.A. Times, Dec. 21, 2007, at A-1.

It is noteworthy that Respondents' big push during that year and a half period to

repatriate Saudi nationals, did not require that returnees have "approval to leave" via

Respondents' annual review process that Respondents claim to be a prerequisite to release. *See*

Ex. 6, Decl. of George O'Loughlin [hereinafter O'Loughlin Decl.].  Like scores of Saudis who

were repatriated during that time period, Petitioner has not been "approved to leave" through

Respondents' internal annual review procedure, commonly referred to as an Administrative

Review Board ("ARB") and Respondents will undoubtedly rely on Petitioner's "uncleared"

status to justify his continuing detention.

But, like the Saudis, the vast majority of transfers from Guantánamo thus far have

resulted from diplomatic efforts by the prisoners' home countries and have not necessarily been

contingent on clearance through Respondents' annual review process. *See, e.g., Ex- Terror*

UNCLASSIFIED//FOR PUBLIC RELEASE

*Detainee Says U.S. Tortured Him*, CBS News, *available at*
http://www.cbsnews.com/stories/2008/03/28/60minutes/main3976928.shtml ("The break in
Kurnaz's case came when the German chancellor asked President Bush for his release."). Even
the few men who were charged and convicted by military commission benefited from advocacy
efforts by their governments. *Full Freedom for Former Australian Detainee,* The New York
Times, *available at* http://www.nytimes.com/2008/12/21/world/asia/21hicks.html ("For years,
the Australian government did virtually nothing while [David Hicks] was at Guantánamo Bay.
Then, under mounting public outcry, the government put pressure on the Bush Administration to
release Mr. Hicks or give him a trial. Under a plea agreement in March 2007, Mr. Hicks pleaded
guilty to one count of providing material support for terrorism and was sentenced to nine months
in prison, which he was allowed to serve in Australia."). Men from countries with close ties to
the United States, many from Europe, went home first, *see generally, The Guantánamo Docket,*
N.Y. Times, *available at* http://projects.nytimes.com/guantanamo/timeline, and men from
countries with less political power, e.g. Yemen, have remained.[6] Gregory D. Johnsen &
Christopher Boucek, *The Dilemma of the Yemeni Detainees at Guantánamo Bay*, 1, CTC
Sentinel, 1 (Nov. 2008).

In fact, Respondents' annual review process illustrates the far-reaching preventive
detention regime that exists at Guantánamo by employing standards for continuing detention that

---

[6] Even Salim Hamdan, a Yemeni, was repatriated in December of 2008, before
completing the sentence meted out by the Military Commission after his conviction for providing
material support for terrorism, although the Bush Administration contemplated continued
detention based on its assertion of unbounded power to detain "enemy combatants." Carol
Rosenberg, *Hunger Strikers Soar to 10 Percent at Guantánamo*, Miami Herald, Jan. 8, 2009,
*available at* http://www.miamiherald.com/news/americas/guantanamo/story/843586.html.

UNCLASSIFIED//FOR PUBLIC RELEASE

radically diverge from law-of-war principles.[7] The annual review process was formally

established by the Secretary of the Navy, Gordon R. England, on September 14, 2004. Mem.

from Dep't of Def., Revised Implementation of Administrative Review Procedures for Enemy

Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba (July 14, 2006), *available at*

http://www.defenselink.mil/news/Aug2006/d20060809ARBProceduresMemo.pdf [hereinafter

DoD ARB Memo]; *see also* Administrative Review Implementation Directive Issued, U.S. Dep't

of Def., Sept. 15, 2004, *available at*

http://www.defenselink.mil/releases/release.aspx?releaseid 7737. The process professes to

review the propriety of continued detention as to each detainee on a yearly basis, taking into

account both previous and new allegations. Dod ARB Memo. The Board determines whether to

recommend release, transfer or continued detention based on vague and unbounded standards of

"threat level," and "intelligence value." *Id.* In considering "continued threat level," the annual

review board is tasked with considering thirteen separate factors, only one of which is "the

likelihood of the enemy combatant again taking up arms against the United States or its allies."

*Id.*

Finally, and most tellingly, the approval for transfer via annual review process is, simply

put, a charade; it is most assuredly *not* a prerequisite to release from Guantánamo. Scores of

men have been released from Guantánamo and repatriated to their home countries without a

release or transfer decision issued by the Administrative Review Board. *See* O'Louglin Decl. at

¶¶ 9-14. Some prisoners have been repatriated without ARB approval, while others who have

---

[7] Notably, it is a *civilian* official, named by the Secretary of Defense, who is the final decision maker and can nullify a recommendation from the Administrative Review Board. Mem. from Dep't of Def., Revised Implementation of Administrative Review Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba, Encl (1) (July 14, 2006), *available at* http://www.defenselink.mil/news/Aug2006/d20060809ARBProceduresMemo.pdf.

been approved still remain at Guantánamo. *See* Guantanamo Docket Timeline. In light of this reality, as to Mr. Al-Shimrani, the "approved" versus "not approved" designation is a truly a distinction without a difference.

Respondents' do not even bother to include in their Amended Factual Return the contents or outcomes of the four annual reviews (years 2005 to 2008) they conducted as to Petitioner, instead relying exclusively on allegations that go solely to the basis for Petitioner's initial detention. In the wake of *Boumediene*, Respondents moved to amend their original Factual Return, filed in January 2006, which consisted solely of Petitioner's CSRT record, dating back to October 18, 2004. *See* Resp'ts' Mot. for Leave to File Am. Factual Return (dkt. no. 99). Over Petitioner's objection, Judge Hogan granted Respondents' motion recognizing that "to accurately determine whether *continued* detention is lawful, a habeas court must have a full and complete record containing all of the facts that bear on the legality of the petitioner's detention." *See* Order Granting Gov't's Mot. for Leave to File Am. Factual Returns (dkt. no. 116) (emphasis added).

In response to the court's recognition of the need for a "full and complete record" "to accurately determine whether continued detention is lawful," (since the CSRT record had been created four years before), Respondents filed an Amended Factual Return that varied very little in substance from the CSRT record and does not even attempt to establish the legal and factual basis for Mr. Al-Shimrani's current and continuing detention. The Amended Factual Return raises a host of allegations, but in essence boils down to three main contentions: (1) ███████████████████ *See* Ex. 3, Classified Annex, (2) that Petitioner received weapons training and (3) that Petitioner fought against the Northern Alliance alongside the Taliban during the summer and fall of 2001. *See* Narrative at 1,9. Even if these allegations are accurate and considered sufficient to establish that Petitioner was an "enemy combatant" under whatever

definition Respondents urge on this Court   though Petitioner in no way concedes either point

the allegations do not establish a lawful purpose for Petitioner's continued detention.

Respondents' record does not establish any legitimate basis for further detention.

### Argument

I.   **Authority to Detain Petitioner Is Based on the AUMF, Which Must Be Interpreted Through Traditional Law-of-War Principles**

Respondents' authority to detain Petitioner as an "enemy combatant" emanates solely

from the Authorization for Use of Military Force ("AUMF"), and the AUMF authorizes no more

than that which established law-of-war principles clearly and unmistakably authorize. *See Hamdi*

*v. Rumsfeld*, 542 U.S. 507, 521 (2004).  Congress passed the AUMF soon after the tragic events

of September 11, 2001.  Though not the sweeping mandate that the former President Bush first

requested,[8] Congress did authorize the President

> to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

Pub. L. No. 107-40, 115 Stat. 224 (2001).  This legislation is the only source of authority for

Respondents' imprisonment of Mr. Al-Shimrani.

Through the AUMF, Congress granted Respondents specific and limited authority to

proceed with a military operation in response to the attacks of September 11. *Id.*  In *Hamdi*, the

Supreme Court applied "traditional long-standing Law of War principles" in its analysis of the

---

[8] The President first requested broader authority to use force against persons unconnected with September 11—to deter and pre-empt any future acts of terrorism or aggression against the United States, Congress refused and passed the narrower AUMF instead. *See* 147 Cong. Rec. S9949-51 (daily ed. Oct. 1, 2001) (statement of Sen. Byrd contrasting the Proposed Joint Resolution Authorizing the Use of Force with the AUMF as actually passed).

AUMF and the scope of the detention that it authorizes. 542 U.S. at 521; *see also Al-Marri v. Pucciarelli*, 534 F.3d 213, 242 (4th Cir. 2008) (en banc) (5-4) (Opinion of Motz, J.) (noting that "nothing in any of the *Hamdi* opinions suggests that lower courts, absent express congressional authorization, are free to venture beyond traditional law-of-war principles").

The *Hamdi* Court made clear that the AUMF did not directly authorize detention of combatants, but found such authority was so "fundamental and accepted an incident to war as to be an exercise of the necessary and appropriate force" granted by the AUMF to Respondents. *Hamdi* at 518. As such, *Hamdi* specifically constrains the detention powers afforded Respondents through the AUMF by those limitations in established law-of-war principles. In short, the Supreme Court found that the law of war is the source of and provides the structure for the detention authority implicit in the AUMF.

Although Respondents' merits-based arguments since *Boumediene* have focused entirely on *who* may be detained pursuant to the AUMF,[9] the *Hamdi* Court made clear that law-of-war principles govern the purpose of detention as well. Respondents' power to detain, based on the AUMF and law-of-war principles, restricts not only who may be detained in the first place, but also the purpose of that detention. Even if Petitioner is someone who may be detained pursuant

---

[9] To date, only Judge Leon has issued merits based decisions, all of which hinged exclusively on whether the petitioner was an "enemy combatant." As to these nine petitioners, the court only considered whether the Petitioner was an "enemy combatant" pursuant to the definition urged on the court by the Government, which the court ultimately adopted. *See* Mem. Order at 5-6, *El Gharani v. Bush*, No. 05-0429 (RJL) (D.D.C. Jan. 14, 2009) ("[T]he question before this Court is whether the Government has shown by a preponderance of the evidence that petitioner el Gharani is being lawfully detained   *i.e.*, that he is an "enemy combatant" under the definition adopted by this Court."); *see also* Mem. Order at 5-6, *Al Alwi v. Bush*, No. 05-2223 (RJL) (D.D.C. Dec. 30, 2008); Mem. Order at 6, *Sliti v. Bush*, No. 05-0429 (RJL) (D.D.C. Dec. 30, 2008); Tr. of Open Habeas Op. Hr'g Before the Hon. Richard J. Leon at 15-16, *Boumediene v. Bush*, No. 04-1166 (RJL) (D.D.C. Nov. 20, 2008).  No habeas court to date has ruled on the proper purpose for detention.

to law-of-war principles, those same principles do not permit his detention for a purpose not clearly recognized by law-of-war principles.

## II.   Traditional Law-of-War Principles Place Explicit Limits on the Purpose of Combatant Wartime Detention

The waging of war is subject to limits and legal restraints that are found in traditional law-of-war principles and a host of treaties that seek to mitigate the human suffering caused by war. *See* Frits Kalshoven, Int'l Comm'n of the Red Cross, *Constraints on the Waging of War*, 1-2, 4 (Martins Nijhoff Publishers, 1987). Captivity, both the imprisonment of combatants and the internment of civilians, is a significant part of the human suffering caused by war. The law of war does not sanction waging war as a means to solve conflict. Rather, it is a body of law developed over hundreds of years recognizing that armed conflict and all its tragic consequences, including captivity, will happen and thus seeks to limit its harm. Sydney D. Bailey, Prohibitions and Restraints in War 76 (Oxford Univ. Press 1972) ("The fundamental humanitarian rule which forms the second basic principle of the Hague Conventions is expressed in double negative form: 'The right of belligerents to adopt means of injuring their enemy is not unlimited.'"). Traditional law-of-war principles impose limits on Respondents' power to detain, specifically as to who they may detain, for what purpose, for how long and under what conditions. *See generally* Derek Jinks & Ryan Goodman, *International Law, U.S. War Powers, and the Global War on Terrorism*, 118 Harv. L. Rev 2653 (2004-2005). Respondents have waged a legal battle to avoid these limiting principles, claiming absolute authority unbounded by law, but that is no longer possible in light of the Supreme Court's decisions in *Hamdi* and *Boumediene*.[10]

---

[10] There can be no derogation from these principles; military necessity cannot undermine the principles of the law of war. Frits Kalshoven, Int'l Comm'n of the Red Cross, *Constraints on the Waging of War*, 25 (Martins Nijhoff Publishers, 1987) ("Obviously, the less favourable the circumstance, the greater the difficulties in the way of implementation of a given rule of the law

## A. Respondents May Not Detain Petitioner for Punitive Purposes

There is no question that a capturing power is prohibited from detaining combatants for the purpose of punishment. A lawful combatant, who has not committed a war crime, is deemed to have done no wrong and thus is not deserving of punishment. Knut Dörmann, *The Legal Situation of "Unlawful/Unprivileged Combatants*," 85 Int'l Rev. Red Cross 45, 45 (2003). An unlawful combatant may be prosecuted, convicted, and punished for war crimes, but absent such procedure detention may not be for the purpose of punishment. *Ex parte Quirin*, 317 U.S. 1, 31 (1942); *see also* Dieter Fleck, The Handbook of Humanitarian Law in Armed Conflicts 701 (Oxford U. Press, 1995) ("Taking an enemy combatant prisoner can . . . never serve as a punishment but only to prevent further participation in military operations against the detaining power."); *Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004) (*citing* W. Winthrop, Military Law and Precedents 788 (rev. 2d ed. 1920) (citations omitted in original)) "It is now recognized that 'Captivity is neither a punishment nor an act of vengeance,' but 'merely a temporary detention which is devoid of all penal character.' . . . 'A prisoner of war is no convict; his imprisonment is a simple war measure."). This principle dates as far back as the Lieber Code, which is recognized as the first codification of the modern law of war, Major Patrick D. Pflaum, *A Matter of Discipline and Security: Prosecuting Serious Criminal Offenses Committed In U.S. Detention Facilities Abroad*, 194 Mil. L. Rev. 66, 72 (2007), and which forbids employing military detention as a punitive device in war. *See* Instructions for the Government of Armies of the United States in the Field (Lieber Code) art. 16, (Apr. 24, 1863), *available at* Yale Law School, Avalon Project, http://avalon.law.yale.edu/19th_century/lieber.asp ("Military necessity does not admit of cruelty    that is, the infliction of suffering for the sake of suffering or for revenge.").

---

of armed conflict. Yet it is not the case that even in such adverse circumstances the rule would simply cease to apply.").

### B. Respondents May Not Detain Petitioner for the Purpose of Interrogation

Moreover, there is no question that fundamental law-of-war principles prohibit a detaining power from detaining or continuing detention for the purpose of interrogation. In the context of an international armed conflict, Geneva Convention Relative to the Treatment of Prisoners of War ("Geneva Convention III") leaves no doubt that the interrogation of prisoners of war is highly limited. The combatant is only "bound to give . . . his surname, first names and rank, date of birth, and army, regimental, personal or serial number, or failing this, equivalent information." Geneva Convention Relative to the Treatment of Prisoners of War art. 17, Aug. 12, 1949, 6 U.S.T. 3316; *see also* U.N. Comm'n on Human Rights, Situation of Detainees at Guantanamo Bay, UN Doc. E/CN. 4/2006/120 (Feb. 27, 2006), *available at* http://www.unhcr.org/refworld/docid/45377b0b0.html ("The indefinite detention of prisoners of war and civilian internees for purposes of continued interrogation is inconsistent with the provisions of the Geneva Conventions."). The detaining power is further prohibited from engaging in "any form of coercion . . . to secure . . . information of any kind whatsoever." *Id.* at art 17. Additionally, "prisoners who refuse to answer may not be threatened, insulted, or exposed to any unpleasant or disadvantageous treatment of any kind." *Id.* This Court need not, however, parse the intricacies of the Geneva Conventions nor determine Petitioner's status under the Conventions to find that wartime military detention for the purpose of interrogation is strictly prohibited. The Supreme Court stated, without qualification, that "indefinite detention for the purpose of interrogation is not authorized." *Hamdi*, 542 U.S. at 521.

Yet from the start, Guantánamo was designed for interrogation purposes. Those selected for transfer to Guantánamo were "[d]etainees whom the U.S. military determine[d] ha[d] a high potential intelligence value *or* pose[d] a particular threat . . . ." Br. for the Resp'ts at 4, *Rasul v.*

*Bush*, 542 U.S. 466 (2004) (No. 03-334). Respondents also admitted that "[t]he intelligence-gathering operations at Guantanamo are an integral component of the military's efforts to 'repel and defeat the enemy' . . . in the ongoing military campaign being waged not only in Afghanistan but around the globe." *Id.* at 54. Moreover, just two months ago Respondents unequivocally declared the *raison d'être* of Guantánamo: "Guantanamo is first and foremost an intelligence operation." Tr. of the Status Hr'g before the Hon. Judge Thomas F. Hogan at 28, *In re Guantánamo Bay Detainee Litig.*, Misc. No. 08-442 (TFH) (D.D.C. Dec. 10, 2008). Finally, at Guantánamo, there is a strong link between interrogation and the duration of detention.

████████████████████, *see* Ex. 4, Classified Annex.

### C. Respondents May Only Detain Petitioner for the Purpose of Preventing Return to the Battlefield

To the extent military detention of combatants is authorized under the AUMF, it is limited to one purpose: preventing return to the battlefield. The *Hamdi* plurality's finding that the detention of combatants is a "fundamental and accepted . . . incident to war" was premised on its finding that "[t]he purpose of detention is to prevent individuals from returning to the field of battle and taking up arms once again." *Hamdi*, 542 U.S. at 518 (*citing* Yasmin Naqvi, *Doubtful Prisoner-of-War Status*, 84 Int'l Rev. Red Cross 571, 572 (2002) (*quoting* decision of Nuremberg Military Tribunal, reprinted in 41 Am. J. Int'l L. 172, 229 (1947) (stating that wartime detention is "neither revenge, nor punishment, but solely protective custody, the only purpose of which is to prevent the prisoners of war from further participation in the war."))); *In re Territo*, 156 F.2d 142, 145 (9th Cir. 1946) ("The object of capture is to prevent the captured individual from serving the enemy."); *see also* Dieter Fleck, The Handbook of Humanitarian Law in Armed Conflicts 701 (Oxford Univ. Press 1995) ("Taking an enemy combatant prisoner

can . . . never serve as a punishment but only to prevent further participation in military operations against the detaining power.").

### D. The Law of War Does Not Permit Detention Until the End of the Relevant Hostilities for Any Purpose Other Than Preventing Return to the Battlefield

Traditional law-of-war principles may permit detention of combatants until the end of hostilities, but only if the detention serves the proper purpose for detention: preventing return to the battlefield. *Hamdi* canot be read to permit otherwise. Just as the Hamdi plurality confined its holding to a narrow category of combatant, i.e. "an individual who was part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who engaged in an armed conflict against the United States there," *Hamdi*, 542 U.S. at 510, 516 (citations omitted), the plurality tethered its finding that the United States may "detain for the duration of these hostilities" to a narrow purpose, preventing return to the battlefield  The *Hamdi* plurality's recognition that military detention of combatants during armed conflict may permit detention until the end of the particular and relevant hostilities simply cannot be read to authorize the duration of detention beyond that which is necessary to prevent return to the relevant battlefield. Hamdi, 542 U.S. at 519 ("Because detention to prevent a combatant's return to the battlefield is a fundamental incident of waging war, in permitting the use of 'necessary and appropriate force,' Congress has clearly and unmistakably authorized detention in the narrow circumstances considered here.").

Historically the nature of war as a struggle between nations precluded the possibility of repatriating combatants before the end of hostilities. Dieter Fleck, The Handbook of Humanitarian Law in Armed Conflicts 372 (Oxford Univ. Press 1995). Thus detention most often continued until the end of the conflict, and in some cases well past that. For example, in World War II, Russia continued to detain 12,000 German soldiers until 1950, and France

detained 630,000 German soldiers through 1947 for purposes of reconstruction work. *Id.* at 325. Geneva Convention III sought to prevent the recurrence of abuses such as these by requiring that "prisoners of war be released and repatriated without further delay after cessation of active hostilities." Geneva Convention Relative to the Treatment of Prisoners of War art. 118, Aug. 12, 1949, 6 U.S.T. 3316; Jean de Preux, International Committee of the Red Cross, Commentary to Convention (III) Relative to the Treatment of Prisoners of War 541 (Jean S. Pictet ed., 1994) (1960).

But here, the relevant armed conflict pursuant to which Respondents detain Mr. Al-Shimrani is highly undefined   characterized as a "global war on terror" by Respondents. There is no doubt, however, that the conflitct's current incarnation is not a war between nations. Thus, if Petitioner is released from Guantánamo he will not be repatriated to the enemy   whether that be Al Qaeda or the Taliban   nor to an enemy nation. Petitioner will be repatriated to his home country of Saudi Arabia, which is a long-standing and close ally of the United States and shares the United States' interest in preventing terrorism. The practical reality of the relevant conflict, then, does not lend itself to a reflexive assertion of power to detain until the end of hostilities.[11]

---

[11] In fact, there is every reason to believe, though Petitioner does not rest his argument on this fact, that the "particular conflict" in which Petitioner was captured   the United States' international war against Taliban-led Afghanistan   has in fact ended. On January 29, 2002, the United States State Department made a determination that the Taliban relinquished control over all territories in Afghanistan. Kenneth Katzman, Afghanistan: Post-War Governance, Security, and U.S. Policy, CRS Report for Congress RL30588, CRS-7 (May 4, 2006); Carlotta Gall, *U.S. Hands Southern Afghan Command to NATO*, N.Y. Times, Aug. 1, 2006, *available at* http://www.nytimes.com/2006/08/01/world/asia/01afghan.html?_r 1&scp 1&sq U.S.%20Han ds%20Southern%20Afghan%20Command%20to%20NATO&st cse. Furthermore, after the Taliban's defeat, a new democratic government assumed power under the guidance of the United States; Afghanistan ratified a new constitution in January 2004, Agreement on Provisional Arrangements in Afghanistan Pending the Re-Establishment of Permanent Government Institutions (Dec. 5, 2001), *available at* http://www.un.org/News/dh/latest/afghan/afghan-agree.htm, held national elections, Carlotta Gall, *Counting Begins in Afghan Presidential Election*, N.Y. Times, Oct. 15, 2004, *available at*

*Hamdi* cannot be read to automatically sanction the detention of an "enemy combatant" until the end of hostilities when Respondents have not met their burden of proving there is any nexus between Petitioner's continuing detention and preventing return to the battlefield.

### III. Respondents' Factual Return Does Not Establish a Proper Basis for Petitioner's Current and Continuing Detention

Respondents' attempt to justify Petitioner's detention through an Amended Factual Return containing a narrative and supporting exhibits "used by the Department of Defense to establish the status of the individual who is the subject of the narrative as an enemy combatant and to substantiate their [sic] detention as an enemy combatant at Guantanamo Bay, Cuba." *See* Resp'ts' Am. Factual Return, Decl. of Rear Admiral David M. Thomas (undated). There is, however, no evidence to support Mr. Al-Shimrani's continuing detention now moving well into eight years. Respondents' narrow view of the issue at hand is part of a continuing effort to grab at unfettered power to detain: first as to who may be detained by crafting a broad definition of "enemy combatant" that falls outside the law of war,[12] and here, by failing to establish a factual basis that supports a legitimate purpose for Petitioner's current and continuing detention. The Great Writ as codified in 28 U.S.C. §§ 2241-2255 demands that the jailor establish the basis for Petitioner's current imprisonment. *See* 28 U.S.C. § 2243 (2008) ("[T]he person having custody of the person detained . . . shall make a return certifying the true cause of detention."); *see also*

---

http://query.nytimes.com/gst/fullpage.html?res 9C0DE7DB173AF936A25753C1A9629C8B63, and successfully completed a disarmament, demobilization and reintegration program implemented during the interim period. Co-Chairs' Summary: The Second Tokyo Conference on Consolidation of Peace in Afghanistan, July 5, 2006, *available at* http://www.mofa.go.jp/region/middle_e/afghanistan/summary0607.html.

[12] *See* Traverse in Supp. of Ahmed Zuhair's Pet. for Writ of Habeas Corpus at 23, *Zuhair v. Bush*, No. 06-0864 (EGS) (D.D.C. Dec. 31, 2008), Pet'r's Resp. to the Ct.'s Dec. 19, 2008 Order and Mem. of Law Concerning the Appropriate Definition of "Enemy Combatant" at 12-15, *Hidar v. Bush*, No. 05-2386 (RBW) (D.D.C. Dec. 29, 2008); Pet'rs' Mem. Regarding the Definition of "Enemy Combatant" at 8-10, *Boumediene v. Bush*, No. 04-1166 (RJL) (D.D.C. Oct. 20, 2008).

*Boumediene v. Bush*, 128 S. Ct. 2229, 2247 (2008) ("The [Suspension] Clause protects the rights of the detained by affirming the duty and authority of the Judiciary to call the jailer to account."). Respondents bear "the burden of proving by a preponderance of the evidence that the Petitioner's detention is lawful." Case Mgmt. Order (dkt. no. 112 at II.A). Respondents' attempt to justify Petitioner's current detention based solely on establishing "enemy combatant" status amounts to Respondents, once again, attempting to avoid judicial review of the legality of this Petitioner's detention.

Mr. Al-Shimrani's designation as an "enemy combatant," however, does not justify his current or continuing detention for over seven years with no end in sight. Respondents seek to minimize their burden by narrowing this Court's inquiry to one issue: whether the Petitioner is an "enemy combatant." But an affirmative answer to that question, under the circumstances of Petitioner's case, does not inextricably lead to a finding of lawful detention. Even assuming Respondents have established the right person was detained, it is not axiomatic that he was detained or continues to be detained for the right *reason*. Respondents fail to recognize that the purpose of wartime detention places limits on their power to detain.[13] Thus, Respondents' Amended Factual Return does not justify the continued detention of Mr. Al-Shimrani for over seven years and counting.

**IV.    Respondents Cannot Justify Petitioner's Current and Continuing Detention**

Respondents evade their burden of establishing a factual basis for Petitioner's current detention because they cannot meet that burden.

---

[13] Respondents' creation of the term "enemy combatant" is a designation of convenience. The definition of "enemy combatant" that Respondents set forth is overbroad and by no means gives Respondents a *carte blanche* to detain Mr. Al-Shimrani indefinitely. *See Al Marri v. Pucciarelli*, 534 F.3d 213, 322 (4th Cir. 2008) (en banc) (5-4) (Opinion of Wilkinson, J.) (faulting the government for failing to suggest "a limiting principle on enemy combatant detentions").

## A.  There Are No Diplomatic Obstacles to Repatriation

There are no diplomatic obstacles to Petitioner's repatriation.  On the contrary, unlike the problems blocking release for so many men at Guantánamo, *see* Josh White, *Lawyers Demand Release of Chinese Muslims: Court Documents Allege Lengthy Detainment at Guantanamo Is Part of Deal With Beijing*, Wash. Post, Dec. 5, 2006 at A13, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2006/12/04/AR2006120401191.html, the path to repatriation for Petitioner is well paved.  Petitioner's nationality is not in dispute.  All parties agree that Mr. Al-Shimrani is a citizen of Saudi Arabia. Narrative at ¶ 1.  Though 2 ▮▮▮▮▮▮▮Saudis remain at Guantánamo, Guantanamo Docket Saudi Arabia, the Saudi government has recognized Petitioner as one of thirteen whose release it actively seeks. *See* Rayner Decl. at ¶ 6.  There is a bilateral agreement between the U.S. and Saudi Arabia to repatriate Saudi citizens held at Guantánamo, a condition of which is that those released will be monitored by the Saudi authorities and post-release reports will be sent to Washington, D.C. Josh White & Robin Wright, *After Guantánamo, 'Reintegration' for Saudis*, Wash. Post, Dec. 10, 2007 *available at* http://www.washingtonpost.com/wp-dyn/content/article/2007/12/09/AR2007120901411.html?sid ST2007121000474.

Saudi Arabia is distinguished among detainee home countries for its well-respected reintegration program.  U.S. officials have visited and approved the program, and the release of Saudi nationals is conditioned on participation. *Id.* ("The Defense Department considered more than 90 percent of the transferred detainees to be terrorist threats to the United States and its allies, but sent them home as part of an agreement that Saudi Arabia would mitigate the threat, according to Cmdr. J.D. Gordon, a Pentagon spokesman.").  As part of Saudi Arabia's broader counter-terrorism effort, the program provides transitional detention, in some cases for up to two

UNCLASSIFIED//FOR PUBLIC RELEASE

years,[14] during which time the men undergo intense reeducation and rehabilitation. *Id.* Successful graduates are released into the care of their families and continually monitored by the Saudi security forces. *Id.* Ongoing financial support enables the men to establish the elements of a long-term, stable future: a home, a job and a family of their own. *Id.*

The recent report from the Department of Defense, released a week before the change of administration on January 13, 2009, states that a number of repatriated detainees, some of whom are Saudi, have "return[ed] to the fight."[15] This report does not discredit the successful collaboration between the United States and Saudi Arabia. In the wake of this news, Navy Commander Jeffrey Gordon, the Pentagon Commander in charge of detainee repatriations since they started, defended previous transfers into the program, and maintained that the Saudi program is "admirable." *U.S. Defends Transfers as Ex-Detainees Vow Terror*, Wash. Post, Jan. 27, 2009, at A08, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2009/01/26/AR2009012602151.html ("The best you can do is work with partner nations in the international community to ensure that they take the steps to mitigate the threat ex-detainees pose.").

Furthermore, previous Department of Defense "return to the fight" reports have been discredited, casting doubt on the reliability of this most recent report. Previous allegations that

---

[14] Human Rights Watch, *Saudi Arabia: Guantánamo Detainees Return to Legal Limbo*, May 25, 2006, *available at*: http://www.hrw.org/en/news/2006/05/25/saudi-arabia-guantanamo-detainees-return-legal-limbo (noting that some prisoners transferred to Saudi Arabia from Guantánamo have been held in Riyadh's al Ha'ir prison without charge or trial, for up to two years).

[15] *Pentagon: 61 ex- Guantánamo Inmates Return to Terrorism*, Reuters, Jan. 13, 2009, *available at* http://www.reuters.com/article/topNews/idUSTRE50C5JX20090113?feedType RSS&feedName topNews&rpc 22&sp true ("Pentagon spokesman Geoff Morrell said 18 former detainees are confirmed as 'returning to the fight' and 43 are suspected of having done [sic] in a report issued late in December by the Defense Intelligence Agency.").

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

certain men "returned to the fight" turned out to have included men whose sole action against the United States was to speak to the press about their detention; men who participated in the making of a documentary; and men who had never been detained at Guantánamo in the first place. Mark Denbeaux, The Meaning of "Battlefield": An Analysis of the Government's Representations of "Battlefield" Capture and "Recidivism" of the Guantánamo Detainees, at 3, 7 (Dec. 10, 2007), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id 1089475. The current report alleging recidivism "identifies no names, dates, places, nor any conduct by released detainees. The raw numbers that are cited are unsupported, inconsistent with all other statements, and appear to be presented to support the internal Department of Defense purposes." Mark Denbeaux, Released Guantánamo Detainees and the Department of Defense: Propaganda by the Numbers?, at 2 (Jan. 15, 2009), *available at* law.shu.edu/center_policyresearch/reports/propaganda_numbers_11509.pdf.

Past statements by the Department of Defense about the number of recidivist detainees have also been erratic from month to month, suggesting that they were compiled in a haphazard manner. *Id.* at 4 ("Department of Defense statements about the number of recidivist detainees, which do not identify the detainee, the act of recidivism, the place, or the time, are especially unreliable . . . . For instance, in the July 12, 2007 DOD press release, the 30 recidivists reported by DOD in April 2007 is reduced to five.").

Furthermore, Saudi Arabia has addressed problems as they develop. The recent Department of Defense report prompted a statement from the Saudi Interior Ministry regarding the re-arrest of men it had deemed rehabilitated but who had been suspected of further involvement with extremist groups. Robert F. Worth, *9 Alumni of Saudi Program for Ex-Jihadists Are Arrested*, N.Y. Times, Jan. 26, 2009, at A16, *available at*

UNCLASSIFIED//FOR PUBLIC RELEASE

http://www.nytimes.com/2009/01/27/world/middleeast/27saudi.html?fta y. The reintegration program is not a stand-alone solution; it exists in the context of a highly developed and well-resourced internal security regime.

But imperfections in the Saudi repatriation program are not the basis for Petitioner's current and continuing detention. These recent reports came to light only within the last month; thus, they do not account for the halt in Saudi repatriations over one year ago. In any case, this Court need not find that the Saudi program meets U.S. security concerns; Respondents made that finding years ago and continue to stand by the program. *U.S. Defends Transfers as Ex-Detainees Vow Terror*, Wash. Post, Jan. 27, 2009, at A08, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2009/01/26/AR2009012602151.html.

## B. Respondents' Annual Review Process Which Purports to Decide Who Is Released or Transferred is a Sham

### 1. The Annual Review Process Does Not Apply Permissible Standards Under the Law of War

The law of war presents a single purpose for wartime detention of a combatant: prevention of his return to the battlefield. Respondents' yearly review of Petitioner's detention, however, does not even consider this purpose as a key factor in assessing the need to continue imprisonment. Rather it analyzes a whole host of other factors, creating an unacceptable standard of review that reveals an unlawful purpose for his continued detention. Respondents have distorted the purpose of military detention, applying standards that have no basis in the law of war, which has, in turn, morphed military detention into an unbounded preventive detention scheme.

Pursuant to Respondents' annual review process, Mr. Al-Shimrani has apparently not yet been "approved to leave Guantanamo." Transfer and Release Decisions for Guantánamo

Detainees from ARB Round Three (Year 2007), Administrative Review Board Assessment and

Recommendation of Mohammed Al-Shimrani at 2099-2111 (Jan. 11 2008), *available at*

http://www.dod.mil/pubs/foi/detainees/csrt_arb/08-F-0481_ARB3DecisionMemos1824-2385.pdf

[hereinafter ARB Mohammed Al-Shimrani 2008]; *see also* Resp'ts' Status Reports and Resp. to

Ct.'s July 11, 2008 Order, Ex. 1, Part 4 (dkt. no. 78-5 at 51) ("The petitioner has not been

approved for release or transfer from Guantanamo Bay by the Department of Defense.").

Following the Supreme Court's decision in *Rasul v. Bush* holding that federal district

courts have jurisdiction to hear habeas petitions brought by prisoners at Guantánamo, 542 U.S.

466 (2004), Respondents set up the Combatant Status Review Tribunals ("CSRT") to

"determine . . . whether the individuals detained . . . at . . . Guantanamo . . . [were] properly

classified as enemy combatants." Mem. from Dep't of Def., Implementation of Combatant

Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base

Guantanamo Bay, Cuba at 1, (July 14, 2006), *available at*

http://www.defenselink.mil/news/Aug2006/d20060809CSRTProcedures.pdf. The

Administrative Review Board was established pursuant to the Deputy Secretary of Defense

Order OSD 06942-04 of May 11, 2004, to then conduct yearly reviews of the detention of each

"enemy combatant." The ARB is mandated to "determine whether the enemy combatant

represents a continuing threat to the U.S. or its allies in the ongoing armed conflict with al Qaida

and its affiliates and supporters (e.g. Taliban), and whether there are other factors that could form

the basis for continued detention (e.g., the enemy combatant's intelligence value and any law

enforcement interest in the detainee)." DoD ARB Memo at 2 ¶ 1(c). The outcome of the reviews

recommend transfer, release, or, as in Mr. Al-Shimrani's case, continued imprisonment. ARB
Mohammed Al-Shimrani 2008.

The standards Respondents employ in conducting the annual reviews are *per se* improper
under established law-of-war principles.  Instead of focusing on the only permissible reason for
detention    preventing return to the battlefield to take up arms once again    Respondents engage
in a broad and far-reaching inquiry having little to do with the limited reason for wartime
detention of combatants.  The reviews examine whether the detainee poses any "threat to the
U.S. and its allies" and apply an unlimited catch-all of "other factors" which includes but is "not
limited to" some consideration of whether the detainee should be charged by military commission
and "whether the enemy combatant is of continuing intelligence value." DoD ARB Memo,
"Standards and Factors to be Considered by the ARB" at Encl. (3) ¶ 3(f)(1); ARB Mohammed
Al-Shimrani 2008.

To assess the "threat" standard, the Annual Review Board is instructed to consider
thirteen factors, only one of which is "[t]he likelihood of the enemy combatant again taking up
arms against the United States or its allies."  As factor eleven on a list of thirteen, it is to be
"carefully considered" and "balanced" against the other factors and "all other relevant
information" in considering whether the "threat" posed by Mr. Al-Shimrani is "high," "medium,"
or "low." DoD ARB Memo, "Standards and Factors to be Considered by the ARB" at Encl. (3)
¶ 3(f)(1)(d), Encl. (13) ¶ 3.  But likelihood of return to the battlefield is not required for
continued detention.  There could be little or no likelihood of return to the battlefield and the
annual review standards would still permit continued detention based on other factors such as
"cooperation of the enemy combatant with the U.S. Government or allied representatives." DoD

ARB Memo at Encl. (3) ¶ 3(f)(1)(d)(4).  The boilerplate Sample Assessment and Recommendation Letter to be used by the ARB to document its recommendation clearly states that "[i]n addition to, *or in spite of,* the threat assessment, the ARB considered the following factors to weigh in favor of the further detention of the enemy combatant," listing "continuing intelligence value" as a possible example. DoD ARB Memo at Encl. (13) ¶ 5 (emphasis added); *see also* Ex. 7, Transfer and Release Decisions for Guantánamo Detainees from ARB Round Two, Administrative Review Board Assessment and Recommendation of Mohammed Al-Shimrani at ¶ 1 (Oct. 4, 2006) ("[A]n Administrative Review Board was conducted on 04 October 2006 to determine whether subject Enemy Combatant continues to be a threat to the United States and its allies *or* whether there are reasons to further detain him in U.S. custody.") (emphasis added). Thus, even if the threat level is considered insignificant, the ARB may recommend continued detention of a prisoner it considers to be of some other value. The 'threat assessment' conducted by Respondents' yearly review procedure, therefore, is not an assessment of whether a particular detainee will return to a particular or relevant battlefield; it is a far more wide-ranging inquiry looking to assess the unbounded standard of "threat to the U.S or its allies." DoD ARB Memo.

Petitioner's most recent annual review record includes agency assessments by the CIA and the FBI, which further indicates the importance attached to intelligence value.  And the records ███████████ reveal that ultimately the Administrative Review Board came to "conclusions and recommendations" as to three categories: "threat level," "intelligence value," and "Detainee Treatment Act Consideration." *See* ARB Mohammed Al-Shimrani 2008 at 2109.

UNCLASSIFIED//FOR PUBLIC RELEASE

Where the only acceptable purpose for detention is to prevent return to the battlefield, release cannot be conditioned on factors that do not speak to that purpose. Respondents' determination that Mr. Al-Shimrani is not "approved to leave" Guantánamo simply indicates Respondents' intention to continue detention, but it does not provide any proof, in and of itself, justifying Petitioner's current and continuing detention. On the contrary, the standards and factors utilized by Respondents in the annual review process demonstrate how far removed the Petitioner's detention is from law-of-war principles and that Respondents are engaged in a far-reaching, preventive-detention scheme unbounded by the law of war and the holding of *Hamdi*.

### 2. Approval for Release or Transfer Through the Annual Review Process Is Not a Prerequisite to Release or Transfer

Respondents' construction of a seemingly elaborate annual review process, *see* DoD ARB Memo "Flow Chart" at Encl. (1), is a charade. In fact, by simply focusing on Saudis for the purpose of this motion, Respondents' own records reveal that scores of Saudis were repatriated home without a release or transfer decision resulting from the annual review process.

The DoD claims the ARB is an annual proceeding to assess whether continued reason exists to believe that an enemy combatant poses a threat to the United States or its allies, or whether there are other factors bearing upon the need for continued detention. *See* Implementation of Administrative Review Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba (Sept. 14, 2004), *available at* http://www.defenselink.mil/news/Sep2004/d20040914adminreview.pdf. In practice this process is applied inconsistently; in some cases it is not applied at all, and detainees are transferred without ARB approval or against ARB recommendations. In short, an ARB assessment is not a necessary prerequisite for release from Guantánamo. *See* O'Loughlin Decl. at ¶¶ 9-14. Thus,

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

Respondents' designation of Mr. Al-Shimrani as "not approved for release or transfer" does not provide any explanation, much less any evidentiary proof, to justify Petitioner's continuing detention.

Multiple examples of Saudi Arabian nationals released from Guantánamo without approval through the annual review process wholly undercut any claim by Respondents that Mr. Al-Shimrani's "not approved" designation is reason for his current detention or stands in the way of his transfer home. On July 19, 2005, four Saudi nationals were released from Guantánamo and returned to Saudi Arabia. A CSRT determined Saleh Abdall al Oshan (ISN 248) should no longer be classified as an enemy combatant, and an ARB recommended that Mishal Awad Sayaf Alhabiri (ISN 207) be released. *See id.* at ¶ 8. Khalid Sulayman Jaydh al Hubayshi (ISN 155) and Maji Afas Radhi al Shimri (ISN 181), however, who the U.S. had previously designated as "enemy combatant[s]," were released *without* an ARB or CSRT recommendation. *See id.* at ¶ 9. On June 24, 2006, two additional Saudi Arabian nationals, Othman Ahmed Othman Al Omairah (ISN 184), and Sadik Ahmad Turkistani (ISN 491), were released without a positive ARB assessment and transferred to Saudi Arabia. *See id.* at ¶ 10.

This trend continued during the latter half of 2007, when forty-eight additional Saudi Arabian nationals were released without favorable ARB assessments: fourteen on July 15, 2007, *see id.* at ¶ 9, sixteen on September 5, 2007, *see id.* at ¶ 10, eleven more on November 9, 2007, *see id.* at ¶ 11, and seven detainees were released on December 27, 2007. *See id.* at ¶ 12. During this period, Respondents continued to conduct annual review hearings, as six Saudi Arabian nationals who were also transferred during this period were approved for transfer or release by their respective ARBs. ARB hearings continued for the rest of the Guantánamo detainees as well. *See id.* at ¶ 13.

UNCLASSIFIED//FOR PUBLIC RELEASE

### 3. Approval for Release or Transfer Through the Annual Review Process Is Not Contingent on the Gravity of Respondents' Allegations

The allegations against Petitioner are neither more nor less egregious than those leveled against many former prisoners. In fact, Respondents' allegations against men long ago released are comparable to those Respondents have leveled against Petitioner, which lays bare the irrelevance of Petitioner's "not approved for release or transfer" status. Respondents put forward three primary allegations against Mr. Al-Shimrani: (1) ███████████████████████, *see* Ex. 3, Classified Annex, (2) Petitioner received weapons training, Narrative at ¶¶ 23-24, and (3) Petitioner fought against the Northern Alliance alongside the Taliban for five months in the summer and fall of 2001 in Afghanistan. Narrative at ¶ 1. However, comparing information available for all detainees, based on Respondents' allegations found in ARB and CSRT records, with Respondent's allegations against Petitioner reveals that detainees with similar, if not identical, allegations against them have been released from Guantánamo.

To begin, Respondents' allegation that Petitioner received weapons training was also leveled against the vast majority of current and former detainees. Focusing specifically on the Al Farouq and the Khalden training camps in Afghanistan, which Respondents claim Mr. Al-Shimrani attended, the number of now-released Saudi detainees alleged to have trained at these camps clearly shows that this is not considered to be a sufficient basis for continued detention. *See* O'Loughlin Decl. at ¶¶ 16, 17. Respondents' allegation that Mr. Al-Shimrani fought with the Northern Alliance alongside Taliban forces in Afghanistan is another common allegation made against many former detainees as well. *See id.* at ¶ 18. The record reveals, however, Respondents long ago released most of these individuals. *See id.*

UNCLASSIFIED//FOR PUBLIC RELEASE

To the extent Respondents rely on allegations against Petitioner of being a "recruiter," *see* Summaries of Detention-Release Factors for Administrative Review Boards (ARB) Round 3, Unclassified Summary of Evidence for ARB in the Case of Al-Shumrant, Muhammad Abd Al-Rahman at 548 (Jan. 7, 2008) ("The detainee was identified as a major recruiter within Saudi Arabia who recruited youths from school."), many other Saudi men accused of "recruiting" have been repatriated. The CSRT for Said Ali al Farha (ISN 341), a 29-year-old Saudi Arabian citizen captured in Pakistan, alleges that Mr. al Farha was associated with Al Qaeda and that he "has recruited at least two individuals for al-Qaida." *See id.* at ¶ 19. Here, Respondents not only allege that the detainee recruited young men to fight, as they did with Petitioner, but also that he recruited for Al Qaeda. Despite this more serious allegation, though, Mr. al Farha was transferred to Saudi Arabia on December, 13, 2006; yet Mr. Al-Shimrani continues to be detained.

Similar to Mr. Farha and Mr. Al-Shimrani, Abdullah Abd al Muin al Wafti's (ISN 262) 2006 ARB alleges that he "was well known by clerics and Imams in Saudi Arabia as a recruiter and fundraiser for jihad." *See id.* at ¶ 19. Yet Mr. Farha was transferred to Saudi Arabia on November 9, 2007. Additionally, Adnan Mohammed Ali (ISN 105) is "on a foreign government service watch list for working as a recruiter outside of Saudi Arabia," yet was still transferred to Saudi Arabia on May 18, 2006. Despite the repatriation of both of these men, Mr. Al-Shimrani remains at Guantánamo.

At least [2] ███████ Saudi Arabian citizens held at Guantánamo have been transferred to Saudi Arabia. Guantanamo Docket Saudi Arabia. These Saudi nationals were transferred in eleven separate groups, and in each of these groups there were men with similar allegations as

UNCLASSIFIED//FOR PUBLIC RELEASE

those leveled against Mr. Al-Shimrani. The patent illogic of this reality demonstrates how worthless Respondents' "not approved" designation is, as to Mr. Al-Shimrani.

### C.  Petitioner Has Not Been Charged by Military Commission

The first military commission started in 2003 pursuant to President Bush's Order of November 13, 2001 governing the "Detention, Treatment, and Trial of Certain-Non-Citizens in the War Against Terrorism," 66 Fed. Req. 57833. *Hamdan v. Rumsfeld*, 548 U.S. 557, 568 (2006). After *Hamdan* struck down the Bush Administration's first military commission system, Congress established a second system of military commissions through passage of the Military Commissions Act of 2006, 10 U.S.C. § 948(a) *et seq.* (Supp. 2007). Pursuant to this grant of authority, the military has brought charges against a total of twenty-seven detainees, eighteen of who are currently awaiting trial at Guantánamo. *See* Benjamin Wittes & Zaahira Wyne, *The Current Detainee Population of Guantánamo: An Empirical Study*, Brookings Institution, at 5, 8, 33 n. 36 (Dec. 16 2008). Even though Petitioner has been held at Guantánamo since January 2002, he has never faced any charges, nor is he "Subject to Charges Under [the] Military Commission Act." Resp'ts' Notice of Filing of Detainee Info. Pursuant to the Ct.'s Jan. 14, 2009 Order, Ex. 1 (dkt. no. 148-1 at 2); *see also* Resp'ts' Status Reports and Resp. to the Ct.'s July 11, 2008 Order, Ex. 1, Part 4 (dkt. no. 78-5 at 51) ("The petitioner has not been charged with crimes triable by military commission under the Military Commissions Act of 2006.").

### V.  Under Fundamental Canons of Construction, the AUMF Cannot Be Read to Authorize Detention Beyond That Permitted Under the Law of War

To sanction Respondents' power to further detain Mr. Al-Shimrani under the circumstances presented here, in which Respondents have not established that the purpose of Mr.

Al-Shimrani's continued detention is to prevent his return to the battlefield, would create a far-reaching preventive detention scheme that cannot be read into the AUMF. To do so ignores fundamental canons of statutory construction.

### A. Congressional Delegation of Law-Making Powers Requires Both a Clear Statement of Intent and Substantive Guidance by Congress

Under Article I, Section 1 of the Constitution, Congress is the sole repository of legislative authority. Moreover, Article I, Section 8 specifically states that it is the responsibility of Congress, not the President, to "make Rules concerning Captures on Land and Water." The Supreme Court has repeatedly held that the constitutional separation-of-powers doctrine bars Congress from engaging in excessive delegation of its lawmaking power to other branches of government. A corollary of the same doctrine requires Congress to set forth an "intelligible principle" by which any delegation of power must be guided. *See Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 472 (2001) ("[W]e have repeatedly said that when Congress confers decisionmaking authority upon agencies *Congress* must lay down by legislative act an intelligible principle to which the person or body authorized to act is directed to conform.") (citations and brackets omitted) (emphasis in original). As determined in *Hamdi*, Congress may have intended the AUMF to authorize military detentions in accordance with established principles of the law of war. 542 U.S. 507 (2004). But it did *not* grant the executive branch authority to go beyond that traditional doctrine, nor did it lay down any "intelligible principle" for so doing.

Constitutional concerns about excessive delegations of power to the Executive are most commonly satisfied through restrictive statutory construction. As the Supreme Court observed in *Mistretta v. United States*: "In recent years, our application of the nondelegation doctrine principally has been limited to interpretation of statutory texts, and, more particularly, to giving

*narrowing constructions* to statutory delegations that might otherwise be thought to be

unconstitutional." 488 U.S. 361, 373 n.7 (1989) (emphasis added); *accord* Lisa Schultz

Bressman, Schechter Poultry *at the Millenium, A Delegation Doctrine for the Administrative*

*State*, 109 Yale L. J. 1399, 1409 (2000) ("The Court has used clear-statement rules and the canon

of avoidance as surrogates for the nondelegation doctrine."); John F. Manning, *The*

*Nondelegation Doctrine as a Canon of Avoidance*, 2000 Sup. Ct. Rev. 223, 242 (2000) ("The

Court's modern strategy [consists] of using the canon of avoidance to promote nondelegation

interests.  Where a statute is broad enough to raise serious concerns under the nondelegation

doctrine, the Court simply cuts back on its acceptable bounds."). *See generally* Cass R. Sunstein,

*Nondelegation Canons*, 67 U. Chi. L. Rev. 315 (2000) (arguing that numerous canons of

statutory construction implement nondelegation doctrine).

    This canon of construction requires that any assertion of legally unprecedented authority

by the executive branch be supported by a clear statement from Congress delegating *and* guiding

the use of that power.  In *FDA v. Brown & Williamson Tobacco Corp.*, for example, the Supreme

Court invalidated FDA tobacco regulations because the FDA had not previously attempted to

regulate tobacco, and the new regulations were unauthorized by a clear delegation from

Congress. 529 U.S. 120, 160 (2000) ("[W]e are confident that Congress could not have intended

to delegate a decision of such economic and political significance to an agency in so cryptic a

fashion."). *See also Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 645

(1980) ("In the absence of a *clear mandate* in the Act, it is unreasonable to assume that Congress

intended to give the Secretary the unprecedented power over industry that would result from the

Government's view [of the statutes].") (emphasis added); *Nat'l Cable Television Ass'n, Inc. v.*

*United States*, 415 U.S. 336, 342 (1974) ("the [nondelegation] hurdles . . . lead us to read the Act

narrowly to avoid constitutional problems"); Thomas W. Merrill, *Rethinking Article I, Section I: From Nondelegation to Exclusive Delegation*, 104 Colum. L. Rev. 2097, 2173 (2004) (in *Brown & Williamson*, the Supreme Court "declined to defer to interpretations that would significantly change the scope of agency power"). Even more recently, nondelegation principles influenced the Court's decision in *Hamdan v. Rumsfeld.* 548 U.S. 557 (2006). As Justice Breyer observed, "*Hamdan*'s conclusion ultimately rests upon a single ground: Congress has not issued the President a 'blank check.'" *Id.* at 636.

### B. A Second Canon of Construction Requires Statutes to Be Narrowly Construed When Individual Liberty Is at Stake

The Supreme Court has repeatedly cautioned that statutes should be construed narrowly when assertions of executive power impinge directly on individual liberty. *Kent v. Dulles*, for example, involved a challenge by the artist Rockwell Kent to a State Department regulation denying passports to Communists. 357 U.S. 116 (1958). In sustaining Kent's challenge, the Supreme Court ruled that it was appropriate to "construe[] narrowly all delegated powers that curtail or dilute [a fundamental liberty]." *Id.* at 129. Because there was no "clear statement" by Congress authorizing the restrictions at issue, the regulation was invalid. *See* Lisa Schultz Bressman, Schechter Poultry *at the Millenium, A Delegation Doctrine for the Administrative State*, 109 Yale L. J. 1399, 1409 (2000) (noting that *Kent v. Dulles* exemplifies how the Court "used the constitutional clear statement canon to avoid a delegation that would impinge on the individual rights of certain passport applicants"). This approach to statutory construction has been consistently followed in cases where the government has sought to restrict an individual's liberty rights. *See, e.g., Webster v. Doe*, 486 U.S. 592, 608 (1988) (Congressional intent "must be clear"); *INS v. St. Cyr*, 533 U.S. 289, 308-09 (2001) (requiring "clear, unambiguous and express statement"); *Green v. McElroy*, 360 U.S. 474-508 (1959) (requiring "explicit authorization").

UNCLASSIFIED//FOR PUBLIC RELEASE

Here, it simply cannot be argued that the AUMF provided clear or explicit authorization to Respondents to adopt a preventative detention scheme premised on wide-ranging considerations such as intelligence value, threat level, or other reasons with no nexus to preventing return to the battlefield.

### C. Constructions That Depart From Accepted Norms of International Law Must Be Avoided Absent a Clear Indication of Congressional Intent

Finally, for more than two centuries it has been a maxim of statutory construction that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Weinberger v. Rossi*, 456 U.S. 25, 32 (1982) (*citing Murray v. The Charming Betsy*, 2 Cranch 64, 188 (1804)); *see, e.g., McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 20 (1963). While Congress is free to override customary international law, is it not lightly presumed to have done so absent a clear indication of such intent. *See* Restatement (Third) of Foreign Relations Law of the United States § 403 (1986).

Here, Respondents' unilateral decision to expand detention beyond the scope envisioned by the law of war represents a deliberate departure from the norms of international law. There is no support in either the text or the legislative history of the AUMF for concluding that Congress intended to authorize the President to abandon the United States' long-standing commitment to the traditional law of war, or to ignore the country's treaty obligations.

### Conclusion

Based on the foregoing reasons, Petitioner seeks an order granting his habeas corpus petition and ordering his release from U.S. custody.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

Dated: February 12, 2008

Martha Rayner (NY-MR-1423)
Lincoln Square Legal Services
Fordham University School of Law
33 West 60th Street, 3d Floor
New York, NY 10023
Telephone: (212) 636-6934
Fax: (212) 636-6923

Counsel for Petitioner Mohammed
Abdul Rahman Al-Shimrani (ISN 195)

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED// FOR PUBLIC RELEASE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MOHAMMED ABDUL<br>RAHMAN AL-SHIMRANI,<br>Guantánamo Bay, Cuba,<br><br>          Petitioner,<br><br>    v.<br><br>BARACK HUSSEIN OBAMA, *et al.*,<br><br>          Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No: 05-2249 (RMC)

## ORDER

Upon consideration of the Petitioner's Motion for Expedited Judgment on the Government's Record, and any responses thereto, it is hereby ordered: (1) Petitioner's habeas corpus petition is GRANTED; and (2) Petitioner shall be RELEASED from United States custody.

**SO ORDERED.**


_____
Rosemary M. Collyer
United States District Judge

Dated: _____

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MOHAMMED ABDUL
RAHMAN AL-SHIMRANI,

             Petitioner,

    v.

GEORGE WALKER BUSH, *et al.*,

             Respondents.

Civil Action No: 05-2249 (RMC)

## DECLARATION OF MARTHA RAYNER, ESQ.

I, Martha Raýner, hereby declare under the penalties of perjury, pursuant to 28 U.S.C. § 1746 that:

1. I am an Associate Clinical Professor of Law at Fordham University School of Law and an attorney associated with Lincoln Square Legal Services, Inc., Fordham University School of Law's clinical law office. I represent Petitioner, Mr. Mohammed Abdul Al-Shimrani, Internment Serial Number ("ISN") 195. I am familiar with all the facts and proceedings in the above-captioned Guantánamo habeas matters.

2. I make this declaration in support of Petitioner's Expedited Motion for Judgment on the Government's Record.

3. This declaration is made on personal knowledge and information made available to me in the performance of my professional duties as counsel to the above-named Petitioner.

4.  I have represented Mr. Al-Shimrani since October of 2005.

5.  Petitioner, Mr. Al-Shimrani, a high school teacher and university graduate who last
    resided in Najran, Saudi Arabia, has been detained at Guantánamo Bay Naval Base
    ("Guantánamo") since January 2002, after first being detained in Pakistan by the
    Pakistani military in December 2001 and then transferred to Kandahar, Afghanistan into
    United States military custody.  One of the first prisoners to arrive at Guantánamo, Mr.
    Al-Shimrani is now one of approximately 250 who remain of the over 770 men who have
    been detained there since 2002.  Respondents have not brought war crimes charges nor
    criminal charges against Mr. Al-Shimrani, and there is no indication Respondents plan to
    do so.

6.  On August 19, 2008, Dr. Naila Alsowayel, Minister, of the Royal Embassy of Saudi
    Arabia to the United States, confirmed during a telephone conversation with me that the
    government of Saudi Arabia seeks the release of Mr. Al-Shimrani from U.S. custody and
    his repatriation to the Kingdom of Saudi Arabia.

7.  On January 30, 2007, I made a request to the Department of Defense, pursuant to the
    Freedom of Information Act, requesting certain records regarding three clients
    imprisoned at Guantánamo, including Mr. Al-Shimrani.  This request was subsequently
    narrowed to a request for "Administrative Review Board (ARB) documents," "[r]ecords
    of interrogations," "[a]ll disciplinary records," and "[a]ll medical records" for two clients,
    one of whom remained Mr. Al-Shimrani.

8.  In response to that request, the Department of Defense provided 2,515 pages of
    documents claiming that they covered the period from when my clients were taken into
    U.S. custody to "on or about July 2007."

9. **Of those documents, 410 pages relate to Mr. Al-Shimrani.** They include disciplinary records, interrogation records and Administrative Review Board records, and are purported to cover from the time Mr. Al-Shimrani came into United States custody until July of 2007. Most pages are completely or heavily redacted. But it is apparent that over half constitute interrogation records representing 88 Summary Interrogation Reports.

10. The Department of Justice, representing the Department of Defense, informed me that 626 pages from my narrowed request were held back, claiming that because the "subject and source" of the documents is classified, they cannot divulge what protected categories the held-back documents fall under. Although some portion of the 626 pages may relate to my other client who was the subject of my narrowed request, there are likely other records within these held-back pages that would reveal that additional interrogations of Mr. Al-Shimrani took place.

11. Ali Al-Shimrani, currently residing in Ridyadh, Saudi Arabia, is Petitioner's brother and next friend. I and legal interns working for Lincoln Square Legal Services have been in touch with Ali and other members of Petitioner's family for over three years.

12. Ali Al-Shimrani has made it clear that he, his mother, and sister all are eagerly awaiting Petitioner's return and committed to assisting in his rehabilitation. The family has created an apartment for Petitioner within their house, where they would welcome both him and a future wife. The family hopes to help Petitioner get married and find a good job. Mr. Ali Al-Shimrani further stated that the entire family is willing to assist Petitioner with everything necessary to resume a normal life upon his release.

13. I declare under the penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
      February 10, 2009

                                                      _____/s/_____
                                                      Martha Rayner

UNCLASSIFIED//FOR PUBLIC RELEASE

# EXHIBIT 2

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE



**CAPTURE CARD FOR PRISONER OF WAR**

For use of this form, see AR 190-8; the proponent agency is DCSPER.

*WRITE LEGIBLY IN BLOCK LETTERS. DO NOT ADD ANY REMARKS*

| NAME (Last, First, MI) | | | GRADE |
|---|---|---|---|
| Al-Shumrani, Muhammad Abd | | | |

| SERVICE NUMBER | POWER SERVED | | PLACE OF BIRTH |
|---|---|---|---|
| | | | Ryad Saudi Arabia |

| DATE OF BIRTH | | MAIDEN NAME OF MOTHER |
|---|---|---|
| 1975 | | Zahra Yassien |

FIRST NAME OF FATHER
Abdelrahman

DATE OF CAPTURE OR TRANSFER

NAME, ADDRESS, AND RELATIONSHIP OF NEXT OF KIN
Wazart Comdur
Abdul Rahman Street, Saudi Arabia

**PHYSICAL CONDITION** (Check applicable box)

| GOOD HEALTH | | RECOVERED | | SICK | SERIOUSLY WOUNDED | |
|---|---|---|---|---|---|---|
| NOT WOUNDED | | CONVALESCENT | | | SLIGHTLY WOUNDED | |
| | | | | | INTERNMENT SERIAL NO. | 0019 |

FORMER ADDRESS

PRESENT ADDRESS (Name of Camp, or Hospital, and Location)

| DATE | |
|---|---|
| 16 Jan 02 | (Reverse) |

REVERSE OF DA FORM 2665-R, MAY 82

# EXHIBIT 5

UNCLASSIFIED//FOR PUBLIC RELEASE

2/6/09 12:02 AM

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

2/6/09 12:02 AM

2
2



UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

2/6/09 12:02 AM

2

2

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

2/6/09 12:02 AM

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

2/6/09 12:02 AM

2
2

UNCLASSIFIED//FOR PUBLIC RELEASE

2/6/09 12:02 AM

2

2

English Translation of Attached Arabic Language News Article

**Al Riyadh Newspaper** (Saudi Arabia)

Friday, 8 Safar, 1429 [Hijri], February 15, 2008, Issue 14480

**13 Saudi detainees remain; will return soon, God-willing..**
**Guantanamo returnees are freed of their psychological disorders and worries as**
**soon as they get on the airplane**

By Turki Al-Umari

They went out searching for a path that was charted out for them or that they charted out for themselves. They went to the farthest frontiers, leaving behind home and family, gentle mothers, affectionate fathers, tender wives, sweet children, and the pure bonds of brotherhood and friendship. And before all else, they left the fortress of the homeland which they missed so much and in which they were freed of their worries upon arrival.

It was a journey through which they tasted the bitterness of war and the sourness of a pursuit gone bad in a country whose people were not spared the flames of war. Some went there as volunteers with charitable societies, while others got lost in the vicissitudes of circumstances only to crash against a painful reality as they were sold cheaply by treacherous mercenaries.

*Al Riyadh* sheds some light on the lives of Guantanamo returnees which the Kingdom has succeeded in bringing back from the detention camp.

**The Kingdom's efforts**

As soon as the United States announced its arrest of 130 Saudi Arabians in Afghanistan and their imprisonment in its detention camp in Guantanamo Bay, which is leased from Cuba, responsible agencies began to follow their case and to demand their return to the Kingdom. While many countries refused to consider the idea of repatriating and welcoming their citizens, King Abdullah's government made a continuous effort to communicate with the detainees, to assure their families in the Kingdom, and to deliver their correspondence. Under the leadership of His Royal Highness Prince Nayef ibn Abdulaziz, his deputy, Prince Ahmed ibn Abdulaziz, and his assistant for security affairs, Prince Muhammad ibn Nayef, the Ministry of Interior contributed to the formation of the Committee to Monitor the Affairs of Saudi Detainees in Guantanamo and has demanded their repatriation. It has also joined in the efforts of the Human Rights Commission and the National Society for Human Rights, which have been monitoring all issues relevant to the detainee affairs, as well as other humanitarian organizations.

**Demanding the repatriation of detainees**

Upon the return of each group of detainees, Minister of Interior Prince Nayef has reiterated that, under directions from King Abdullah and Crown Prince Sultan ibn Abdulaziz, the Kingdom continues its efforts to bring back all Saudis detained in

Guantanamo Bay. In these efforts, the Kingdom's position is strengthened by its signature commitment to regulations and instructions, as confirmed by the Saudis who have been repatriated. This commitment forms the basis of all communications undertaken regarding the repatriation of all remaining Saudis.

Under the constant supervision of Prince Muhammad ibn Nayef, the Ministry of Interior prepared a program for the rehabilitation of returnees which commences before they arrival. A team of national security and psychosocial experts is flown aboard the airplane that would transport the detainees back home after conducting medical examination and providing needed medication. Upon arrival in the Kingdom, they are placed in Al-Ha'ir correctional facility, in a section that is suitable for their condition. Afterwards, the process of psychological and religious counseling begins on an individual basis. Next, they are moved to a care facility where they participate in an academic program comprising religion, psychology, sociology [broken sentence] a psychological history profile. The program is run by a team of specialists with Ph.D. in their respective fields. The program also covers economics [broken sentence] through time schedules. The program focuses on generating dialog throughout the lectures.

The program also includes sports, recreation, and visits by the returnees to their families for the purpose of reintegrating them into society and supplying them with [text missing?] to prevent problems in the future, God forbid.

**Bringing good news**

Upon the return of each group, Prince Muhammad ibn Nayef makes sure to announce the good news to their families, a gesture that has had a great impression showing his interest in the cause of their children. He also makes sure to receive all their requests. These calls usually occur during the early dawn hours just before the arrival of the returnees in their homeland. Such attention has demonstrated the prince's humanitarian interest and his keen watchfulness of the process of repatriation until they arrive in the Kingdom.

The mother of repatriated detainee Sa`d Al-Bawardi described the moment she received the call of Prince Muhammad ibn Nayef as a joy that she had never felt all her life, especially after the long years of waiting and worrying about her son when he was detained in Guantanamo and when she was not able to communicate with him except through redacted letters.

The father of another detainee, Bandar Al-Otaibi, expressed his joy by prostrating down in gratitude to God in the lobby of Qasr Al-Riyadh Hotel just before he was taken to visit his son. Mr. Ayedh Al-Otaibi said that Prince Muhammad's call took away all the worries that he had endured during the absence of his son.

"Prince Muhammad ibn Nayef is the epitome of brotherly compassion," one of the repatriated detainees interviewed by *Alriyadh* said, in reaction to the prince's gestures of caring.

**The lesson of captivity**

Muhammad Al-Harbi, a repatriated detainee, said that he had gone [to Afghanistan] to participate with other Muslims in providing aid as a religious duty, being himself a son of the Kingdom that is well known for its aid to all Muslim countries. However, after the chaos that ensued during the U.S. war in Afghanistan, he was taken into custody by the

Americans after a group of treacherous mercenaries handed him over to them. Despite promises to release him, he was transferred to Guantanamo.

### Isolation from society

Dr. Turki ibn Muhammad Al-Otayyan, a psychologist who specializes in abnormal behavior, says that the isolation that the repatriated detainees had endured away from civilization and from family, and which blocked them physically and psychologically from the world, has had an impact upon them. They have been away from their country for six years during which many changes have happened, especially in the area of technology. The information supplied to them by the lawyers provided them with an incomplete picture of what was going on in the Islamic and Arab world. Therefore, he added, repatriated detainees require rehabilitation and information about their home society that has developed during their years of absence from home.

Dr. Al-Otayyan clarified that most Saudi Arabian detainees have enough knowledge of their faith to enable them to withstand and deal with the events. What they lack after their repatriation is the ability to adjust to new information and factors.

There are many examples of the changes that the returnees will face, he added. Take for example a married man who returns to find his children at a different stage in their development. Other examples include the death a relative during the years of absence, and the technological developments. At the times the detainees left home, the cell phone was at its infancy, a relatively simple technology. Today, some handheld devices are as complex as computers. The same goes for buildings, urban development, and population growth.

Prison affects people psychologically and physically, especially when one is imprisoned in a far away country with no contact with family or with his home society, Al-Otayyan continued. Prison causes behavioral effects, but they resolve on their own. When the detainees return to their families and touch the ground of their country, they will be able to overcome some of the simple behavioral abnormalities and return to normality.

Dr. Al-Otayyan explained that one may be perplexed, worried, tense, afraid, and in a state of shock, but as soon as he arrives, all of these things go away. This is like when someone loses his family: he suffers psychologically, his eating and drinking become irregular, in addition to physical changes, but as soon as he returns to his normal state, he does not need any psychotherapy. Most returnees do not have severe psychological disorders or mental problems. Some of the issues they have are more related to the detainees' own personalities, their level of education, their cultural awareness, and the depth of their faith. Some are stronger than others. "I asked some detainees about their feeling at the moment of getting aboard the airplane," Dr. Al-Otayyan continued. "They said it was in indescribable feeling, especially after the take off and the assurance that they were now in the hands of Saudi Arabians. Some of them said that their worries and pains all went away at that moment."

Regarding the physical manifestations of the psychological suffering, Dr. Al-Otayyan explained that some of the physical issues that some of the returnees have are related to being present in a war zone subject to bombardment in Afghanistan rather than to the psychological impact.

Dr. Al-Otayyan also said that part of the program is designed to find out if their earlier ideas have changed and to supply them with knowledge about their faith. "When we asked some of them about the desire to go back to Afghanistan," Dr. Al-Otayyan added, "they denied having any such desire, affirming that they had benefited from their past experience and that the views of religious scholars about this matter were correct."

### Group 1 (May 16, 2003): Five detainees

Fahd ibn Abdullah Al-Shibani, Mish`al ibn Muhammad Al-Shudookhi, Ibrahim ibn Abdullah Al-Umar, Sa`d ibn Ibrahim Al-Zahrani, Ibrahim Al-Sahli

### Group 2 (July 21, 2005): Three detainees

Mish`al Al-Harbi, Khaled Al-Juhani, Saleh ibn Abdullah Al-Oshan

### Group 3 (November 5, 2005): One detainee

Majid Affas Radhi Al-Shammari

### Group 4 (April 20, 2006): 15 detainees

Sa`d Farhan Hatem Al-Maliki, Khaled Abdullah Abdulrahman Al-Moorqi, Ibrahim Dhaifallah Nu`aiman Al-Sahli, Khaled Rashed Ali Al-Marri, Adel Oqla Hasan Al-Nusairi Al-Ruwaili, Su`ood Baz`an Ishq Al-Shibani Al-Otaibi, Abdulhadi ibn Muhammad Badan Al-Subai`i. Muhammad ibn Jayed Hadi Al-Subai`i, Fahd Saleh Sulayman Al-Jutaili, Abdullah Ibrahim Abdullah Al-Rushaidan, Abdulrahman Uthman Ahmed Al-ghamdi, Abdullah Hamed Muhammad Al-Qahtani, Nawwaf ibn Fahd Humood Al-Otaibi, Rashed Awwad Rashed Al-Uwaidha, Adnan Muhammad Ali Al-Sayegh.

### Group 5 (June 26, 2006): 14 detainees, including a permanent resident from Turkistan

Musa Abdulwahhab Abdulqadir Al-Hoosawi, Yousef Khamees Abdullah Al-Sulaimani, Muhammad Surooroo Dakheelallah Al-Otaibi, Abdussalam Ghaithan Mureef Al-Shehri, Uthman Ahmad Uthman Al-Ghamdi, Saleh Ali Zaheed (or Zuhaid) Al-Khath`ami, Abdulaziz Abdulrahman Abdulaziz Al-Badah, Siddeeq Ahmad Siddeeq Noor Turkistani, Rashid Abdulmuslih Qayed Al-Qayed, Tariq Shallah Hasan Al-Harbi, Abdullah Muhammad Saleh Al-Ghanmi, Ibrahim Muhammad Ibrahim Al-Nasir, Sa`d Ibrahim Sa`d Al-Badna, Wasm Awwad Umar Al-Wasm

### Group 6 (December 14, 2006): 16 detainees

Muhammad Yahya Muhsin Al-Zayla`I, Saleem Salman Awadhallah Al-Harbi, Yousef Abdullah Saleh Al-Rubaish, 4. Sulaiman Sa`d Muhammad Al-Oshan, Jabir Jubran Ali Al-Fifi, Ibrahim Sulaiman Muhammad Al-Rubaish, Abdullah Muhammad Al-Yamani, Anwar Hamdan Muhammad Al-Noor, Hajji Hajjaj Awadh Al-Sulami, Abdulaziz Muhammad Ibrahim Al-Nasir, Ziyad Saeed Faraj Al-Jahdali, Majid Hamad Abdulrahman Al-Furaih, Bassam Muhammad Saleh Al-Dubaikhi, Saeed Ali Al-Farha Al-Ghamdi, Sultan Sari Sayil Al-Anazi, Abdulrahman Muhammad Husain Khawran

### Group 7 (February 21, 2007): Seven detainees

Majed Abdullah Husain Al-Harbi, Rashed Awadh Khalaf al Balkhair Al-Ghamdi, Faisal Saleh Buraikan Al-Naser, Muhammad Abdullah Saqr Al-Alawi Al-Harbi, Naser Mazyad Abdullah Al-Subai`i, Majed Abdullah Al-Joodi, Majed Aidha Muhammad Al-Qurashi

**Group 8 (July 16, 2007): 16 detainees**

Fahd Nasser Muhammad Sultan Al-Qahtani, Saud Dakhilallah Muslih Al-Juhani, Muhammad Naji Subhi Al-Mahyawi Al-Juhani, Yahya Samil Suwaimil Al-Alyani Al-Sulami, Bjad Dhaifallah Huwaimil Al-Otaibi, Mazin Saleh Musa`id Al-Awfi, Abdulrahman Owaidha Muhammad Al-Ju`aid, Bandar Ahmad Mubarak Al-Jabri, Sa`d Ibrahim Ramzi Al-Zahrani, Muhammad Abdulrahman Ayed Al-Qurashi, Hmood Dakhilallah Al-Jad`ani, Khalid Muhammad Ali Al-Zahrani, Jum`ah Muhammad Abdullatif Al-Dosari, Bandar Ayedh Hmood Al-Otaibi, Abdullah Husain Sa`d Al-Zahrani, Ghanim Abdulrahman Ghanim Al-Harbi

**Group 9 (September 7, 2007): 16 detainees**

Abdulhadi Abdullah Ibrahim Al-Sharikh, Abdulrazzaq Abdullah Ibrhim Al-Sharikh, Fahd Atiyya Hamza Al-Harazi, Rami Sa`d Ghalib Al-Ju`aid, Abdulhakim Abdulkarim Amin Bukhari, Khalid Hasan Husain Al-Barakati Al-Sharif, Majid Abdullah Sa`id Barayyan, Muhammad Mubarak Salim Al-Kurbi, Abdullah Thani Faris Al-Sulami Al-Anazi, Zabin Zhahir Zabin Al-Fudaili Al-Shammari, Abdulaziz Sa`d Muhammad Al-Oshan, Moosa Ali Sa`id Al Sa`id Al-Omari, Salim Abdullah Sa`id Al Buhaish Al-Shihri, Fahd Muhammad Abdullah Al-Fowzan, Imran Bakr Muhammad Hosawi, Bakri Awad Bakri Al-Sumairi (or Al-Samiri)

**Group 10 (November 10, 2007): 14 detainees**

Fahd Omar Abdulmajeed Al-Omari Al-Shareef, Yousef Muhammad Mubarak Al-Jubairi Al-Shehri, Fahd Sultan Obaid Al-Osaimi Al-Otaibi, Turki Mashoori Zayed Al Jibli Aseeri, Sultan Ahmed ibn Al-Dardeer Owaida, Nayef Abdullah Ibrahim Al-Nukhailan, Abdullah Abdulmueen Al-Wafi Al-Harbi, Muhammad Ateeq Owaidh Al-Awfi Al-Harbi, Saeed Ali Jabir Al Khaitham Al-Shihri, Hani Saeed Muhammad Al Khalf Al-Ghamdi, Khalid Saud Abdulrahman Al-Bawardi, Murtadha Ali Saeed Moqrim, Jabir Hasan Muhammad Al-Jabra Al-Qahtani, Zaid Muhammad Saad Al Husain Al-Ghamdi

**Group 11 (December 29, 2007): 10 detainees**

Ziad Saleh Muhammad Al-Bahooth, Mish`al Sa`d Abdulaziz Al-Rasheed, Jameel Ali Atyan Al-Ka`bi, Khaled Milweh Shaye` Al-Qahtani, Nayef Fahd Mutlaq Al-Otaibi, Abdullah Aydha Abdullah Al-Mutrafi, Abdullah Aali Nayef Al-Otaibi, Bandar Ali Abdulaziz Al-Rumaihi

Abdulrahman Nashi Badi Al-Otaibi, Abdulhakim Abdulrahman Abdulaziz Al-Moosa

**Still detained (13 detainees)**

Ahmed Zaid Salem Zuhair, Jubran Sa`d Ware` al Nashet Al-Qahtani, Khaled Muhammad Sa`d Al-Saif, Sa`d Muhammad Husain al Mufleh Al-Qahtani, Shaker Abdulraheem Muhammad Amer, Abdulrahman Shalabi Eisa Owaidha, Abdulaziz Kudaim Salem Al-Eili, Ghassan Abdullah Ghazi Al-Shurbi, Muhammad Abdulrahman Awn Al-Shimrani, Muhammad Mani` al Sha`lan Al-Qahtani, Muhammd Mardhi Eisa Al-Mufaddali Al-Zahrani, Yousef Khalil Abdullah Noor, Khaled Muhammad Ali Al-Zahrani

**Died in detention**

June 2006 (Two Saudi Arabian detainees): Mani` ibn Shaman Al-Otaibi, Yaser Talal Al-Zahrani

June 2007 (One Saudi Arabian detainee): Abdulrahman Ma`adha Zhafer Al-Umari

UNCLASSIFIED//FOR PUBLIC RELEASE

# EXHIBIT 6

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOHAMMED ABDUL RAHMAN AL-SHIMRANI,           ) <br>            ) <br>            ) <br>    Petitioner,    ) <br>            ) <br>            ) <br>            ) <br>    v.           ) <br>            ) <br> BARACK  HUSSEIN OBAMA, *et al.*,    ) <br>            ) <br>    Respondents.    ) <br>            ) | Civil Action No: 05-2249 (RMC) |

## DECLARATION OF GEORGE O'LOUGHLIN

I, George O'Loughlin, hereby declare under the penalties of perjury, pursuant to 28 U.S.C. § 1746 that:

1.  I am a second year student at Fordham University School of Law and a legal intern with Lincoln Square Legal Services, Inc., Fordham University School of Law's clinical law office. I am a member of Mr. Mohammed Abdul Rahman Al-Shimrani's legal team, supervised by Associate Clinical Professor Martha Rayner. Respondents have assigned Internment Serial Number ("ISN") 195 to Mr. Al Shimrani. I am familiar with the facts and proceedings in his habeas matter, No. 05-2249 (RMC), filed on November 7, 2005.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

2.      I make this declaration in support of Petitioner's Motion for Expedited Judgment on the Government's Record.

3.      This declaration is based on information gathered from two sources. The first is The Office of the Secretary of Defense and Joint Staff Reading Room website, *available at* http://www.dod.mil/pubs/foi/detainees/csrt_arb/index.html. The website describes itself as "the single, unified starting point for finding military information online" and provides Administrative Review Board ("ARB") records as well as Department of Defense ("DoD") release and transfer decisions from the "first round" ARBs that took place over the course of the year 2005 through the "third round" taking place during the year 2007. Information was also gathered from *The New York Times' "The Guantánamo Docket,"* which is an interactive database of Pentagon documents and *New York Times* research regarding men who have been detained at Guantánamo as enemy combatants since January 2002 and includes Pentagon documents related to the Combatant Status Review Tribunals ("CSRT") and documents from the subsequent ARBs, *available at* http://int-shared1.ec2.nytimes.com/guantanamo database.

4.      For ease of citation, information available in *The New York Times' "The Guantánamo Docket"* has been cited in place of the DoD's website. The information contained therein mirrors information posted on the DoD's website.

5.      For ARB rounds one and two (years 2005 and 2006), the DoD has published three sets of records. The first two sets of records provide portions of the actual ARB record and proceedings for each prisoner reviewed that year. The third set of records is a list titled "Transfer and

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

Release Decisions for Guantanamo Detainees from ARB Round [One, Two]," which discloses the outcome of that year's ARB process, only if there is a decision to release or transfer. As to the third round ARBs (year 2007), DoD published "Decision Reports" that disclose the decision to release or transfer as well as detain. Thus, the DoD's website appears to publish all release and transfer decisions issued by the ARBs from 2005 to 2007.

6.      An examination of these sources as of February 6, 2009 revealed that 117 Saudi nationals have been released from Guantánamo since May 14, 2003. Of those 117 Saudi nationals, five (5) were released before the CSRTs began and fifty-two (52) were released *without* approval for release or transfer by the ARB. The ARB process was in existence and on-going throughout the period when detainees were released from Guantánamo without ARB approval.

7.      The sections below list Guantánamo detainees who have been released or transferred and the specifics of each individual's CSRT or ARB status.

8.      On July 19, 2005 the following men detained at Guantánamo were released by CSRT determination or ARB approval:

(1) Saleh Abdall al Oshan (ISN 248) is a 29-year-old citizen of Saudi Arabia. He was ███████████████ He was transferred to Saudi Arabia on July 19, 2005. Saleh Abdall al Oshan, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/guantanamo/detainees/248-saleh-abdall-al-oshan, CSRT at 1733 ("The Combatant Status Review Tribunal's determination that Detainee...shall no longer be classified as an enemy combatant is approved.");

UNCLASSIFIED//FOR PUBLIC RELEASE

(2) Mishal Awad Sayaf Alhabiri (ISN 207) is a 28- or 29-year-old citizen of Saudi Arabia. He was captured in Afghanistan in 2001. He was transferred to Saudi Arabia on July 19, 2005. Mishal Awad Sayaf Alhabiri, *The Guantánamo Docket*, N.Y. Times, *available at* http://int-shared1.ec2.nytimes.com/guantanamo/detainees/207-mishal-awad-sayaf-alhabiri, Transfer and Release Decisions for Guantanamo Detainees from ARB Round One at 298 (May 5, 2005) ("RECOMMENDATION: That the DCO…Release [signed]").

9.      In 2005, the following individual was released from DoD detention in Guantánamo *without* ARB approval for release or transfer:

(1) Khalid Sulayman Jaydh al Hubayshi (ISN 155) is a 33- or 34-year-old citizen of Saudi Arabia. He was captured in Pakistan in December 2001. He was transferred to Saudi Arabia on July 19, 2005. Khalid Sulayman Jaydh al Hubayshi, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/155-khalid-sulayman-jaydh-al-hubayshi;

(2) Maji Afas Radhi al Shimri (ISN 181) is a 34-year-old citizen of Saudi Arabia. He was captured in Pakistan. He was transferred to Saudi Arabia on November 4, 2005. Maji Afas Radhi al Shimri, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/guantanamo/detainees/181-maji-afas-radhi-al-shimri.

UNCLASSIFIED//FOR PUBLIC RELEASE

10.     On June 24, 2006, the following men were released from DoD detention at Guantánamo *without* ARB approval for release or transfer:

> (1) Othman Ahmed Othman Al Omairah (ISN 184) is a 35- or 36-year-old citizen of Saudi Arabia. He was captured near the Pakistan-Afghan border in December 2001. He was transferred to Saudi Arabia on June 24, 2006. Othman Ahmed Othman Al Omairah, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantanamo/detainees/184-othman-ahmed-othman-al-omairah;

> (2) Sadik Ahmad Turkistani (ISN 491) is a citizen of Saudi Arabia. He was transferred to Saudi Arabia on June 24, 2006. Sadik Ahmad Turkistani, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantanamo/detainees/491-sadik-ahmad-turkistani#1.

11.     On July 15, 2007, the following men were released from DoD detention at Guantánamo *without* ARB approval for release or transfer:

> (1) Fahed Nasser Mohamed (ISN 013) is a 26-year-old citizen of Saudi Arabia. He was captured in Afghanistan. He was transferred to Saudi Arabia on July 15, 2007. Fahed Nasser Mohammed, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/guantanamo/detainees/13-fahed-nasser-mohamed;

> (2) Saud Dakhil Allah Muslih al Mahayawi (ISN 053) is a 32-year-old citizen of Saudi Arabia. He was captured near the Pakistan-Afghan border in December 2001. He was transferred to Saudi Arabia on July 15, 2007. Saud Dakhil Allah Muslih al Mahayawi, *The Guantánamo Docket*, N.Y. Times, *available at*

UNCLASSIFIED//FOR PUBLIC RELEASE

http://int-shared1.ec2.nytimes.com/Guantánamo/detainees/53-saud-dakhil-allah-muslih-al-mahayawi;

(3) Muhamad Naji Subhi al Juhani (ISN 062) is a 41-year-old citizen of Saudi Arabia. He was captured in Pakistan in December 2001. He was transferred to Saudi Arabia on July 15, 2007. Muhamad Naji Subhi al Juhani, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/62-muhamad-naji-subhi-al-juhani;

(4) Yahya Samil al Suwaymil al Sulami (ISN 066) is a 29-year-old citizen of Saudi Arabia. He was captured in Pakistan in December 2001. He was transferred to Saudi Arabia on July 15, 2007. Yahya Samil al Suwaymil al Sulami, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/66-yahya-samil-al-suwaymil-al-sulami;

(5) Bijad Thif Allah al Atabi (ISN 122) is a 37-year-old citizen of Saudi Arabia. He was captured in Afghanistan. He was transferred to Saudi Arabia on July 15, 2007. Bijad Thif Allah al Atabi, *The Guantánamo Docket*, N.Y. Times, *available at* http://int-shared1.ec2.nytimes.com/Guantánamo/detainees/122-bijad-thif-allah-al-atabi;

(6) Mazin Salih Musaid al Awfi (ISN 154) is a 29-year-old citizen of Saudi Arabia. He was captured near the Pakistan-Afghan border in December 2001. He was transferred to Saudi Arabia on July 15, 2007. Mazin Salih Musaid al Awfi, *The Guantánamo Docket*, N.Y. Times, *available at*

http://projects.nytimes.com/Guantánamo/detainees/154-mazin-salih-musaid-al-awfi;

(7) Bandar Ahmad Mubarak al Jabri (ISN 182) is a 29-year-old citizen of Saudi Arabia. He was captured in Afghanistan. He was transferred to Saudi Arabia on July 15, 2007. Bandar Ahmad Mubarak al Jabri, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/182-bandar-ahmad-mubarak-al-jabri;

(8) Said Ibrahim Ramzi al Zahrani (ISN 204) is a 27- or 28-year-old citizen of Saudi Arabia. He was captured in Afghanistan in 2001. He was transferred to Saudi Arabia on July 15, 2007. Said Ibrahim Ramzi al Zahrani, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/204-said-ibrahim-ramzi-al-zahrani;

(9) Muhammad Abd al Rahman al Kurash (ISN 214) is a 31- or 32-year-old citizen of Saudi Arabia. He was transferred to Saudi Arabia on July 15, 2007. Muhammad Abd al Rahman al Kurash, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/214-muhammad-abd-al-rahman-al-kurash;

(10) Humud Dakhil Humud Said al Jadan (ISN 230) is a 35-year-old citizen of Saudi Arabia. He was captured in Pakistan. He was transferred to Saudi Arabia on July 15, 2007. Humud Dakhil Humud Said al Jadan, *The Guantánamo Docket*, N.Y. Times, *available at* http://int-

UNCLASSIFIED//FOR PUBLIC RELEASE

shared1.ec2.nytimes.com/Guantánamo/detainees/230-humud-dakhil-humud-said-al-jadan;

(11)     Khalid Mohammed al Zaharni (ISN 234) is a 36- or 37-year-old citizen of Saudi Arabia. He was captured in Pakistan. He was transferred to Saudi Arabia on July 15, 2007. Khalid Mohammed al Zaharni, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/234-khalid-mohammed-al-zaharni;

(12)     Abdullah al Tayabi (ISN 332) is a 28- or 29-year-old citizen of Saudi Arabia. He was captured near the Pakistan-Afghan border in November 2001. He was transferred to Saudi Arabia on July 15, 2007. Abdullah al Tayabi, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/332-abdullah-al-tayabi;

(13)     Abd al Hizani (ISN 370) is a 32- or 33-year-old citizen of Saudi Arabia. He was captured in Afghanistan in November 2001. He was transferred to Saudi Arabia on July 15, 2007. Abd al Hizani, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/370-abd-al-hizani;

(14)     Ghanim Abdul Rahman al Harbi (ISN 516) is a 34-year-old citizen of Saudi Arabia. He was captured in Afghanistan. He was transferred to Saudi Arabia on July 15, 2007. Ghanim Abdul Rahman al Harbi, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/516-ghanim-abdul-rahman-al-harbi.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

12.     On September 5, 2007, the following men were released from DoD detention at Guantánamo *without* ARB approval for release or transfer:

(1) Majid al Barayan (ISN 051) is a 36-year-old citizen of Saudi Arabia. He was captured near the Pakistan-Afghan border in December 2001. He was transferred to Saudi Arabia on September 5, 2007. Majid al Barayan, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/51-majid-al-barayan;

(2) Abd al Razaq Abdallah Hamid Ibrahim al Sharikh (ISN 067) is a 25-year-old citizen of Saudi Arabia. He was captured near the Pakistan-Afghan border in December 2001. He was transferred to Saudi Arabia on September 5, 2007. Abd al Razaq Abdallah Hamid Ibrahim al Sharikh, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/67-abd-al-razaq-abdallah-hamid-ibrahim-al-sharikh;

(3) Fahed al Harazi (ISN 079) is a 30-year-old citizen of Saudi Arabia. He was captured in Afghanistan. He was transferred to Saudi Arabia on September 5, 2007. Fahed al Harazi, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/79-fahed-al-harazi;

(4) Abdul Aziz Saad al Khaldi (ISN 112) is a 29-year-old citizen of Saudi Arabia. He was captured in Afghanistan in November 2001. He was transferred to Saudi Arabia on September 5, 2007. Abdul Aziz Saad al Khaldi, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/112-abdul-aziz-saad-al-khaldi;

UNCLASSIFIED//FOR PUBLIC RELEASE

(5) Salim Abdallah Said Bahaysh (ISN 126) is a 27-year-old citizen of Saudi Arabia. He was captured in Afghanistan. He was transferred to Saudi Arabia on September 5, 2007. Salim Abdallah Said Bahaysh, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/126-salim-abdallah-said-bahaysh;

(6) Musa Bin Ali Bin Said al Amri (ISN 196) is a 30-year-old citizen of Saudi Arabia. He was captured near the Pakistan-Afghan border in 2001. He was transferred to Saudi Arabia on September 5, 2007. Musa Bin Ali Bin Said al Amri, *The Guantánamo Docket*, N.Y. Times, *available at* http://int-shared1.ec2.nytimes.com/Guantánamo/detainees/196-musa-bin-ali-bin-said-al-amri;

(7) Fahd Muhammed Abdullah al Fouzan (ISN 218) is a 25-year-old citizen of Saudi Arabia. He was captured near the Pakistan-Afghan border in December 2001. He was transferred to Saudi Arabia on September 5, 2007. Fahd Muhammed Abdullah al Fouzan, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/218-fahd-muhammed-abdullah-al-fouzan;

(8) Abdulhadi Abdallah Ibrahim al Sharakh (ISN 231) is a 26-year-old citizen of Saudi Arabia. He was captured in Pakistan. He was transferred to Saudi Arabia on September 5, 2007. Abdulhadi Abdallah Ibrahim al Sharakh, *The Guantánamo Docket*, N.Y. Times, *available at* http://int-shared1.ec2.nytimes.com/Guantánamo/detainees/231-abdulhadi-abdallah-ibrahim-al-sharakh;

(9) Bader al Bakri al Samiri (ISN 274) is a 31- or 32-year-old citizen of Saudi Arabia. He was transferred to Saudi Arabia on September 5, 2007. Bader al Bakri al Samiri, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/274-bader-al-bakri-al-samiri;

(10)     Rami Bin Said al Taibi (ISN 318) is a 28-year-old citizen of Saudi Arabia. He was captured in Pakistan in December 2001. He was transferred to Saudi Arabia on September 5, 2007. Rami Bin Said al Taibi, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/318-rami-bin-said-al-taibi;

(11)     Khalid Hassan Husayn al Barakat (ISN 322) is a 33- or 34-year-old citizen of Saudi Arabia. He was captured near the Pakistan-Afghan border in 2001. He was transferred to Saudi Arabia on September 5, 2007. Khalid Hassan Husayn al Barakat, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/322-khalid-hassan-husayn-al-barakat;

(12)     Mohammed Mubarek Salah al Qurbi (ISN 342) is a 30-year-old citizen of Saudi Arabia. He was captured in Pakistan in November 2001. He was transferred to Saudi Arabia on September 5, 2007. Mohammed Mubarek Salah al Qurbi, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/342-mohammed-mubarek-salah-al-qurbi;

(13)     Amran Baqur Mohammed Hawsawi (ISN 368) is a 33- or 34-year-old citizen of Saudi Arabia. He was captured in Pakistan. He was transferred to

Saudi Arabia on September 5, 2007. Amran Baqur Mohammed Hawsawi, *The Guantánamo Docket*, N.Y. Times, *available at*

http://projects.nytimes.com/Guantanamo/detainees/368-amran-baqur-mohammed-hawsawi;

(14)      Abdul Hakim Bukhary (ISN 493) is a 53- or 54-year-old citizen of Saudi Arabia. He was transferred to Saudi Arabia on September 5, 2007. Abdul Hakim Bukhary, *The Guantánamo Docket*, N.Y. Times, *available at*

http://projects.nytimes.com/Guantanamo/detainees/493-abdul-hakim-bukhary;

(15)      Abdallah Faris al Unazi Thani (ISN 514) is a 28-year-old citizen of Saudi Arabia. He was captured in Afghanistan in 2001. He was transferred to Saudi Arabia on September 5, 2007. Abdallah Faris al Unazi Thani, *The Guantánamo Docket*, N.Y. Times, *available at*

http://projects.nytimes.com/Guantanamo/detainees/514-abdallah-faris-al-unazi-thani;

(16)      Zaban Thaaher Zaban al Shamaree (ISN 647) is a 29- or 30-year-old citizen of Saudi Arabia. He was captured in Afghanistan. He was transferred to Saudi Arabia on September 5, 2007. Zaban Thaaher Zaban al Shamaree, *The Guantánamo Docket*, N.Y. Times, *available at*

http://projects.nytimes.com/Guantanamo/detainees/647-zaban-thaaher-zaban-al-shamaree.

13.    On November 9, 2007, the following men were released from DoD detention at Guantánamo *without* ARB approval for release or transfer:

UNCLASSIFIED//FOR PUBLIC RELEASE

(1) Sultan Ahmed Dirdeer Musa al Uwaydha (059) is a 33-year-old citizen of Saudi Arabia. He was captured near the Pakistan-Afghan border in December 2001. He was transferred to Saudi Arabia on November 9, 2007. Sultan Ahmed Dirdeer, *The Guantánamo Docket*, N.Y. Times, *available at* Musa al Uwaydha http://int-shared1.ec2.nytimes.com/Guantánamo/detainees/59-sultan-ahmed-dirdeer-musa-al-uwaydha;

(2) Khalid Saud Abd al Rahman al Bawardi (ISN 068) is a 31 or 32 year-old citizen of Saudi Arabia. He was captured in Pakistan in December 2001. He was transferred to Saudi Arabia on November 9, 2007. Khalid Saud Abd al Rahman al Bawardi, *The Guantánamo Docket*, N.Y. Times, *available at* http://int-shared1.ec2.nytimes.com/guantanamo/detainees/68-khalid-saud-abd-al-rahman-al-bawardi;

(3) Yussef Mohammed Mubarak al Shihri (ISN 114) is a 23-year-old citizen of Saudi Arabia. He was captured in Afghanistan. He was transferred to Saudi Arabia on November 9, 2007. Yussef Mohammed Mubarak al Shihri, *The Guantánamo Docket*, N.Y. Times, *available at* http://int-shared1.ec2.nytimes.com/Guantánamo/detainees/114-yussef-mohammed-mubarak-al-shihri;

(4) Faha Sultan (ISN 130) is a 36- or 37-year-old citizen of Saudi Arabia. He was captured in Afghanistan in 2001. He was transferred to Saudi Arabia on November 9, 2007. Faha Sultan, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/130-faha-sultan;

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

(5) Turki Mash Awi Zayid al Asiri (ISN 185) is a 33-year-old citizen of Saudi Arabia. He was captured near the Pakistan-Afghan border in December 2001. He was transferred to Saudi Arabia on November 9, 2007. Turki Mash Awi Zayid al Asiri, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantanamo/detainees/185-turki-mash-awi-zayid-al-asiri;

(6) Murtadha al Said Makram (ISN 187) is a 32-year-old citizen of Saudi Arabia. He was captured in Pakistan. He was transferred to Saudi Arabia on November 9, 2007. Murtadha al Said Makram, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantanamo/detainees/187-murtadha-al-said-makram;

(7) Fahd Umr Abd al Majid al Sharif (ISN 215) is a 32-year-old citizen of Saudi Arabia. He was captured in Afghanistan. He was transferred to Saudi Arabia on November 9, 2007. Fahd Umr Abd al Majid al Sharif, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantanamo/detainees/215-fahd-umr-abd-al-majid-al-sharif;

(8) Abdullah Abd al Muin al Wafti (ISN 262) is a 42-year-old citizen of Saudi Arabia. He was captured in Pakistan in November 2001. He was transferred to Saudi Arabia on November 9, 2007. Abdullah Abd al Muin al Wafti, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantanamo/detainees/262-abdullah-abd-al-muin-al-wafti;

UNCLASSIFIED//FOR PUBLIC RELEASE

(9) Mohamed Atiq Awayd al Harbi (ISN 333) is a 35-year-old citizen of Saudi Arabia. He was captured in Pakistan in 2001. He was transferred to Saudi Arabia on November 9, 2007. Mohamed Atiq Awayd al Harbi, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/guantanamo/detainees/333-mohamed-atiq-awayd-al-harbi.

(10) Hani Saiid Mohammad al Khalif (ISN 438) is a 36- or 37-year-old citizen of Saudi Arabia. He was captured in Afghanistan in 2001. He was transferred to Saudi Arabia on November 9, 2007. Hani Saiid Mohammad al Khalif, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantanamo/detainees/438-hani-saiid-mohammad-al-khalif;

(11) Jabir Hasan Muhamed al Qahtani (ISN 650) is a 30-year-old citizen of Saudi Arabia. He was captured in Afghanistan in November 2001. He was transferred to Saudi Arabia on November 9, 2007. Jabir Hasan Muhamed al Qahtani, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantanamo/detainees/650-jabir-hasan-muhamed-al-qahtani.

14. On December 28, 2007, the following men were released from DoD detention at Guantánamo *without* ARB approval for release or transfer:

(1) Abdallah Aiza al Matrafi (ISN 005) is a 44-year-old citizen of Saudi Arabia. He was captured in Pakistan in December 2001. He was transferred to Saudi Arabia on December 28, 2007. Abdallah Aiza al Matrafi, *The Guantánamo Docket*, N.Y.

UNCLASSIFIED//FOR PUBLIC RELEASE

Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/5-abdallah-aiza-al-matrafi;

(2) Mesh Arsad al Rashid (ISN 074) is a 28- or 29-year-old citizen of Saudi Arabia. He was captured in Afghanistan. He was transferred to Saudi Arabia on December 28, 2007. Mesh Arsad al Rashid, *The Guantánamo Docket*, N.Y. Times, *available at* http://int-shared1.ec2.nytimes.com/Guantánamo/detainees/74-mesh-arsad-al-rashid;

(3) Jamil Ali al Kabi (ISN 216) is a 35- or 36-year-old citizen of Saudi Arabia. He was captured near the Pakistan-Afghan border. He was transferred to Saudi Arabia on December 28, 2007. Jamil Ali al Kabi, *The Guantánamo Docket*, N.Y. Times, *available at* http://int-shared1.ec2.nytimes.com/Guantánamo/detainees/216-jamil-ali-al-kabi;

(4) Abdullah Ali al Utaybi (ISN 243) is a 36- or 37-year-old citizen of Saudi Arabia. He was captured near the Pakistan-Afghan border in November 2001. He was transferred to Saudi Arabia on December 28, 2007. Abdullah Ali al Utaybi, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/guantanamo/detainees/243-abdullah-ali-al-utaybi;

(5) Zaid Binsallah Mohammed Il Bhawith (ISN 272) is a 26- or 27-year-old citizen of Saudi Arabia. He was captured in Pakistan in December 2001. He was transferred to Saudi Arabia on December 28, 2007. Zaid Binsallah Mohammed Il Bhawith, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/272-zaid-binsallah-mohammed-il-bhawith;

(6) Khalid Malu Shia al Ghatani (ISN 439) is a 25- or 26-year-old citizen of Saudi Arabia. He was captured in Afghanistan. He was transferred to Saudi Arabia on December 28, 2007. Khalid Malu Shia al Ghatani, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/439-khalid-malu-shia-al-ghatani;

(7) Abdul Hakim Abdul Rahman Abduaziz al Mousa (ISN 565) is a 32-year-old citizen of Saudi Arabia. He was captured in Pakistan in February 2002. He was transferred to Saudi Arabia on December 28, 2007. Abdul Hakim Abdul Rahman Abduaziz al Mousa, *The Guantánamo Docket*, N.Y. Times, *available at* http://int-shared1.ec2.nytimes.com/Guantánamo/detainees/565-abdul-hakim-abdul-rahman-abduaziz-al-mousa.

15.     Saudi Arabian nationals detained at Guantánamo who were transferred between July 15, 2007 and December 28, 2007 and were approved for release or transfer their respective ARBs:

(1) Abdul Rahman Owaid Mohammad al Juaid (ISN 179) is a 28-year-old citizen of Saudi Arabia. He was captured in Pakistan. He was transferred to Saudi Arabia on July 15, 2007. Abdul Rahman Owaid Mohammad al Juaid, *The Guantánamo Docket*, N.Y. Times, *available at* http://int-shared1.ec2.nytimes.com/Guantánamo/detainees/179-abdul-rahman-owaid-mohammad-al-juaid;

(2) Nayif Abdallah Ibrahim Ibrahim (ISN 258) is a 26- or 27-year-old citizen of Saudi Arabia. He was captured in Afghanistan. He was transferred to Saudi Arabia on November 9, 2007. Nayif Abdallah Ibrahim Ibrahim, *The Guantánamo*

*Docket*, N.Y. Times, *available at*

http://projects.nytimes.com/Guantánamo/detainees/258-nayif-abdallah-ibrahim-

ibrahim;

(3) Said Ali al Shihri (ISN 372) is a 35-year-old citizen of Saudi Arabia. He was

captured in Pakistan in December 2001. He was transferred to Saudi Arabia on

November 9, 2007. Said Ali al Shihri, *The Guantánamo Docket*, N.Y. Times,

*available at* http://projects.nytimes.com/Guantánamo/detainees/372-said-ali-al-

shihri;

(4) Faris Muslim al Ansari (ISN 253) is a 24- or 25-year-old citizen of Saudi Arabia.

He was captured near the Pakistan-Afghan border. He was transferred to Saudi

Arabia on December 28, 2007. Faris Muslim al Ansari, *The Guantánamo Docket*,

N.Y. Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/253-

faris-muslim-al-ansari;

(5) Abdul Rahman Nashi Badi al Hataybi (ISN 268) is a 28- or 29-year-old citizen of

Saudi Arabia. He was captured near the Pakistan-Afghan border. He was

transferred to Saudi Arabia on December 28, 2007. Abdul Rahman Nashi Badi al

Hataybi, *The Guantánamo Docket*, N.Y. Times, *available at*

http://projects.nytimes.com/Guantánamo/detainees/268-abdul-rahman-nashi-badi-

al-hataybi;

(6) Nayif Fahd Mutliq al Usaymi (ISN 436) is a 29- or 30-year-old citizen of Saudi

Arabia. He was captured in Afghanistan. He was transferred to Saudi Arabia on

December 28, 2007. Nayif Fahd Mutliq al Usaymi, *The Guantánamo Docket*,

N.Y. Times, *available at* http://projects.nytimes.com/Guantánamo/detainees/436-nayif-fahd-mutliq-al-usaymi.

16.     Examples of Saudi nationals imprisoned at Guantánamo, alleged to have attended Al Farouq and have since been released include:

(1)  Abd al Razaq Abdallah Hamid Ibrahim al Sharikh (ISN 67) is a 25-year-old citizen of Saudi Arabia. He was captured near the Pakistan-Afghan border in December 2001. He was transferred to Saudi Arabia on September 5, 2007. Abd al Razaq Abdallah Hamid Ibrahim al Sharikh, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/guantanamo/detainees/67-abd-al-razaq-abdallah-hamid-ibrahim-al-sharikh, ARB *Transcripts* at 23 (2006) ("The detainee explained he was at the al Farouq Training Camp for about two months where he spent the first month learning weapons and the second month actually practicing with them." "In al Farouq I trained on Kalashnikov, Makarov, PK, and RPG.");

(2)  Fahd Umr Abd al Majid al Sharif (ISN 215) is a 32-year-old citizen of Saudi Arabia. He was captured in Afghanistan. He was transferred to Saudi Arabia on November 9, 2007. Fahd Umr Abd al Majid al Sharif, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/guantanamo/detainees/215-fahd-umr-abd-al-majid-al-sharif, ARB *Summaries* at 1 (2006) ("The detainee received training at al Farouq Training Camp.");

(3)  Tariqe Shallah Hassan al Harbi (ISN 265) is a 25- or 26-year-old citizen of Saudi Arabia. He was captured near the Pakistan-Afghan border. He was transferred to

Saudi Arabia on June 24, 2006. Tariqe Shallah Hassan al Harbi, *The Guantánamo Docket*, N.Y. Times, *available at*

http://projects.nytimes.com/guantanamo/detainees/265-tariqe-shallah-hassan-al-harbi, ARB *Summaries* at 2 (2006) ("At the al Farouq training camp, he received training on the Kalashnikov rifle and pistols.");

(4) Ghanim Abdul Rahman al Harbi (ISN 516) is a 34-year-old citizen of Saudi Arabia. He was captured in Afghanistan. He was transferred to Saudi Arabia on July 15, 2007. Ghanim Abdul Rahman al Harbi, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/guantanamo/detainees/516-ghanim-abdul-rahman-al-harbi, ARB *Summaries* at 2 (2006) ("The detainee was at al Farouq from July to September 2001.");

(5) Nayif Abdallah Ibrahim Ibrahim (ISN 258) is a 26- or 27-year-old citizen of Saudi Arabia. He was captured in Afghanistan. He was transferred to Saudi Arabia on November 9, 2007. Nayif Abdallah Ibrahim Ibrahim, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/guantanamo/detainees/258-nayif-abdallah-ibrahim-ibrahim, ARB *Transcripts* at 3 (2006) ("The detainee went to al Farouq, Afghanistan for about 15 days." "The detainee knew that al Farouq, Afghanistan belonged to Usama Bin Laden, and the detainee realized upon arrival that al Farouq was a terrorist training camp with political motivations, not religious goals.").

17.     Examples of Saudi nationals, imprisoned at Guantánamo, alleged to have attended

Khalden and have since been released include:

(1) Khalid Sulayman Jaydh al Hubayshi (ISN 155) is a 33- or 34-year-old citizen of

Saudi Arabia. He was captured in Pakistan in December 2001. He was

transferred to Saudi Arabia on July 19, 2005. Khalid Sulayman Jaydh al

Hubayshi, *The Guantánamo Docket*, N.Y. Times, *available at*

http://projects.nytimes.com/guantanamo/detainees/155-khalid-sulayman-jaydh-al-

hubayshi, CSRT at 1 ("I went to Afghanistan in 1997, to the Khalden Camp in

Khost.");

(2) Faris Muslim al Ansari (ISN 253) is a 24- or 25-year-old citizen of Saudi Arabia.

He was captured near the Pakistan-Afghan border. He was transferred to Saudi

Arabia on December 28, 2007. Faris Muslim al Ansari, *The Guantánamo Docket*,

N.Y. Times, *available at* http://int-

shared1.ec2.nytimes.com/guantanamo/detainees/253-faris-muslim-al-ansari, ARB

*Summaries* at 1 (2005) ("The detainee was a heavy weapons specialist who

attended training at Khalden Camp in 1995.");

(3) Abdul Hakim Bukhary (ISN 493) is a 53- or 54-year-old citizen of Saudi Arabia.

He was transferred to Saudi Arabia on September 5, 2007. Abdul Hakim

Bukhary, *The Guantánamo Docket*, N.Y. Times, *available at* http://int-

shared1.ec2.nytimes.com/guantanamo/detainees/493-abdul-hakim-bukhary, ARB

*Summaries* at 1 (2006) ("The detainee stated that he attended the Khalden Camp

for three weeks." "While at the Khalden Camp, the detainee received training on

the 82 mm mortar, anti-aircraft guns, Uzi, M16, pistol, the Kalashnikov rifle and urban training.");

(4) Yahya Samil al Suwaymil al Sulami (ISN 66) is a 29-year-old citizen of Saudi Arabia. He was captured in Pakistan in December 2001. He was transferred to Saudi Arabia on July 15, 2007. *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/guantanamo/detainees/66-yahya-samil-al-suwaymil-al-sulami, ARB *Summaries* at 1 (2006) ("After the detainee was married, he left for Afghanistan and trained at the Khalden training camp in Khowst, Afghanistan.").

18.     Examples of Saudi nationals imprisoned at Guantánamo, alleged to have fought against the Northern Alliance and have since been released include:

(1) Fahd Umr Abd al Majid al Sharif (ISN 215) is a 32-year-old citizen of Saudi Arabia. He was captured in Afghanistan. He was transferred to Saudi Arabia on November 9, 2007. Fahd Umr Abd al Majid al Sharif, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/guantanamo/detainees/215-fahd-umr-abd-al-majid-al-sharif, ARB *Summaries* at 2 (2006) ("The detainee fought on the front lines for approximately nine months and fired his weapon at Northern Alliance Forces.");

(2) Mesh Arsad al Rashid (ISN 074) is a 28- or 29-year-old citizen of Saudi Arabia. He was captured in Afghanistan. He was transferred to Saudi Arabia on December 28, 2007, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/guantanamo/detainees/74-mesh-arsad-al-rashid, ARB

*Summaries* at 2 (2006) ("The detainee stated he was a Taliban soldier who fought

on the front lines against the Northern Alliance.");

(3) Said Ibrahim Ramzi al Zahrani (ISN 204) is a 27- or 28-year-old citizen of Saudi

Arabia. He was captured in Afghanistan in 2001. He was transferred to Saudi

Arabia on July 15, 2007. Said Ibrahim Ramzi al Zahrani, *The Guantánamo*

*Docket*, N.Y. Times, *available at*

http://projects.nytimes.com/guantanamo/detainees/204-said-ibrahim-ramzi-al-

zahrani, ARB *Summaries* at 1 (2006) ("Around 25 April 2001 the detainee

decided on his own to travel to Afghanistan to fight against the Northern

Alliance." "The detainee spent approximately three months in Afghanistan

fighting the Northern Alliance and then returned home to Saudi Arabia." "In June

2001 the detainee returned to Afghanistan to fight against the Northern Alliance

again.").

19.     Examples of Saudi nationals imprisoned at Guantánamo, alleged to have participated in

recruiting activities and have since been released:

(1) Said Ali al Farha (ISN 341) is a 29-year-old citizen of Saudi Arabia. He was

captured in Pakistan. He was transferred to Saudi Arabia on December 13, 2006.

Said Ali al Farha, *The Guantánamo Docket*, N.Y. Times, *available at*

http://projects.nytimes.com/guantanamo/detainees/341-said-ali-al-farha, CSRT at

1 ("The detainee has recruited at least two individuals for al-Qaida.");

(2) Abdullah Abd al Muin al Wafti (ISN 262) is a 42-year-old citizen of Saudi

Arabia. He was captured in Pakistan in November 2001. He was transferred to

Saudi Arabia on November 9, 2007. Abdullah Abd al Muin al Wafti, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/guantanamo/detainees/262-abdullah-abd-al-muin-al-wafti, ARB at 2 (2006) ("A source stated that the detainee was well known by clerics and Imams in Saudi Arabia as a recruiter and fundraiser for jihad.");

(3) Adnan Mohammed Ali (ISN 105) is a 31-year-old citizen of Saudi Arabia. He was captured in Afghanistan in 2001. He was transferred to Saudi Arabia on May 18, 2006. Adnan Mohammed Ali, *The Guantánamo Docket*, N.Y. Times, *available at* http://projects.nytimes.com/guantanamo/detainees/105-adnan-mohammed-ali, ARB at 1 (2005) ("The detainee is on a foreign government service watch list for working as a recruiter outside of Saudi Arabia.").

I declare under the penalty of perjury that the foregoing is true and correct.

Dated:      New York, New York
            February 12, 2009

                                    _____

                                    George O'Loughlin

UNCLASSIFIED//FOR PUBLIC RELEASE

# EXHIBIT 7

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE



~~SECRET//NOFORN//ORCON~~

**DEPARTMENT OF DEFENSE**
**OFFICE FOR THE ADMINISTRATIVE REVIEW OF**
**THE DETENTION OF ENEMY COMBATANTS (OARDEC)**
AT U.S. NAVAL BASE GUANTANAMO BAY, CUBA
1010 DEFENSE PENTAGON, WASHINGTON, D. C. 20301-1010

04 October 2006

From:   Presiding Officer of Administrative Review Board Panel #50 (U)
To:     Designated Civilian Official (U)
Via:    Director, OARDEC (U)

Subj:   (U)   ASSESSMENT AND RECOMMENDATION FOR THE ADMINISTRATIVE
              REVIEW OF THE DETENTION OF ENEMY COMBATANT ISN 195 (U)

Ref:    (a) (U)   Deputy Secretary of Defense Order OSD 06942-04 of 11 May 04 (U)
        (b) (U)   Deputy Secretary of Defense Revised Implementation Directive 14 Jul 06 (U)

Encl:   (1) (U)   Director, OARDEC, Memorandum for the Record of 25 May 06 (U)
        (2) (U)   Notification of the Decision of an Administrative Review Board (U)
        (3) (U)   Enemy Combatant Election Form (U)
        (4) (U)   Matters Submitted on Behalf of Enemy Combatant (U)
        (5) (U)   Classified Record of Proceedings and Basis for Administrative Review Board
                  Decision for ISN 195 (S//NF//OC)
        (6) (U)   Copies of Documented Evidence Presented to the Board (S//NF//OC)

1. (U) Per references (a) and (b), an Administrative Review Board was conducted on 04 October
2006 to determine whether subject Enemy Combatant continues to be a threat to the United
States and its allies or whether there are reasons to further detain him in U.S. custody.
Enclosures (1) through (6) pertain.

2. (S//NF) After review and deliberation, Administrative Review Board Panel #50 determined
by a vote of 3 to 0 that Enemy Combatant ISN 195 (b)(5)
(b)(5)     The Board specifically determined the following:

Threat Assessment          (b)(5)
Intelligence Value
Other Factors

3. (S//NF) The Administrative Review Board recommends to the Designated Civilian Official that the
Enemy Combatant (b)(5)
(b)(5)

(b)(3):S(1),(b)(6)

Colonel, USAF
Presiding Officer

~~SECRET//NOFORN//ORCON~~

UNCLASSIFIED//FOR PUBLIC RELEASE